777 A.2d 1002 (2001)
343 N.J. Super. 88
Shirley Potoczak HALL, Priscilla Skyta, Paul Potoczak and the Estate of Leon Potoczak, Plaintiffs-Appellants,
v.
SAINT JOSEPH'S HOSPITAL, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted February 20, 2001.
Decided July 25, 2001.
*1004 Clara R. Smit, East Brunswick; Marc Charmatz and Mary Vargas, of the Maryland bar, admitted pro hac vice, attorneys for appellants (Ms. Smit, on the brief).
Respondent has not filed a brief.
Before Judges HAVEY, CUFF and LISA.
*1003 The opinion of the court was delivered by CUFF, J.A.D.
Leon Potoczak was deaf and communicated primarily through American Sign Language (ASL). He was admitted to defendant Saint Joseph's Hospital (Hospital) ten times between 1987 and 1996. He died in 1996 following a stroke. Defendant did not provide ASL interpreters during any of these hospitalizations. Following their father's death in 1996, plaintiffs Shirley Potoczak Hall, Priscilla Skyta, Paul Potoczak, his widow, and the Estate of Leon Potoczak filed a five count complaint against defendant Saint Joseph's Hospital alleging violations of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -42(LAD), the Americans With Disabilities Act, 42 U.S.C.A. §§ 12101 to 12213(ADA), and the Rehabilitation Act of 1973, 29 U.S.C.A. §§ 701 to 796(RA) *1005 (Count One); intentional infliction of emotional distress (Count Two); outrageous conduct (Count Three); conduct giving rise to punitive damages (Count Four); and the failure to secure the informed consent of decedent (Count Five).
Plaintiffs Hall, Skyta, and Paul Potoczak[1] were required to interpret for their father during the various hospitalizations. Plaintiffs allege that the Hospital discriminated against decedent by failing to reasonably accommodate his disability by providing him with an effective means of communication. His children also contend that the discrimination affected them by denying them an equal opportunity to participate in their father's medical care in the same manner as nondisabled patients and their families.[2]
The adult children of Leon Potoczak and his estate, appeal from a jury verdict in favor of defendant on their common law and statutory claims alleging that the Hospital discriminated against their father and them when it failed to provide an interpreter. Plaintiffs argue that the trial judge erroneously found that the Hospital's conduct did not constitute a continuing violation of decedent's rights. Thus, the trial judge confined plaintiffs' claims to the September 1995 and December 1995 hospitalizations. Plaintiffs also argue that the trial judge irreparably prejudiced the presentation of their case by limiting the scope of their claim just minutes before delivery of their opening statement. Plaintiffs further contend that the judge erroneously precluded the witnesses from referring to incidents which occurred during prior hospitalizations. They contend that this testimony would have established a pattern and practice of discrimination by the Hospital. Finally, plaintiffs urge that the jury instructions on the issue of reasonable accommodation in this context was wrong and that the trial judge exhibited bias against the plaintiffs which irreparably tainted the trial. We affirm.
Leon Potoczak's main form of communication was ASL. He went to the Trenton School for the Deaf, a resident facility, from the time he was seven years old until he graduated from high school. Both his first wife, plaintiffs' mother, who died in 1973, and his second wife, Rozelle Potoczak, were deaf and communicated with decedent in ASL. Plaintiffs, all of whom have normal hearing, communicated with decedent through ASL. They learned to sign from their parents but had no formal training. They could communicate basic information through signing, but not abstract ideas or technical information. None of the children were certified ASL interpreters or eligible for certification.
Decedent worked as a linotype operator, which required minimal communication. All of his friends were deaf and he had belonged to several organizations and clubs for the deaf.
Decedent read lips "only a very little," could read the newspaper but not complicated documents, did not write well, and verbalized in a way that no one outside of the family could understand. Decedent owned a TTY/TDD (text telephone), an electronic device with a keyboard and screen that is connected to the telephone.
*1006 Priscilla Skyta, decedent's oldest child, testified that her father used the TTY/TDD to communicate simple messages, such as "I'll be there at six p.m.," but not for longer conversations because he had trouble writing English.
Plaintiffs' linguistics expert, Judy A. Shepard-Kegl, Ph.D., explained why decedent had difficulty with written English. ASL is a visual gestural language that is not at all like English. Instead of subject/verb/object word ordering as in English, ASL is "discourse oriented." Shepard-Kegl considered decedent culturally deaf. She also considered his primary and preferred language to be ASL; in fact, she said that he was nearly monolingual in ASL. He appeared to be a fluent ASL signer, so if he had a qualified ASL signer at the Hospital, he would have understood the medical procedures he was undergoing.
In 1987, decedent first entered Saint Joseph's Hospital for kidney stones, but was diagnosed at that time with heart problems resulting from rheumatic fever that he had as a child and that led to his loss of hearing. He returned to the Hospital a month later, September 1987, for valve replacement and double bypass heart surgery; three times in June 1989 for renal colic and a blocked left kidney; in May 1992 for cardiac catheterization; in July 1992 for repair of a prosthetic aortic valve; in September 1995 for gastrointestinal bleeding; in October 1995 for urinary problems; and in December 1995 for a stroke and respiratory failure. He died in the Hospital on January 4, 1996, at the age of seventy-one.
Plaintiffs testified to their limited ability to interpret for their father while he was hospitalized. They could communicate basic information, but anything complicated, such as explaining the medical tests that were going to be performed, was very difficult for them. They also testified that they withheld information from their father which they believed might worry or upset him. Skyta described how humiliated her father felt when invasive rectal tests had not been adequately explained to him. He was also visibly frightened when a nasogastric tube was inserted through his nose because he did not fully understand what was about to happen or why.
Decedent's children testified that they requested an interpreter for their father numerous times during his various hospitalizations and their requests were ignored by Hospital staff. Sometimes plaintiffs did not relay their father's requests for an interpreter because they feared that the staff would not treat their father well if they were overly demanding.[3] Skyta put up a sign near his bed saying, "Patient is deaf. Please look at him"; but despite the sign, Hospital staff often came into his room and started talking to him.
The day before her father died, Skyta wrote and hand-delivered a letter to Sister Jane Francis, president of the Hospital, requesting an interpreter and other accommodations. As soon as she delivered the letter, someone hooked up a TTY/TDD at the nurse's station and a closed-caption television. Skyta testified that she was moved to act when she noticed a Patients' Bill of Rights on the Hospital wall. According to the document, patients were entitled to clear communication and the Hospital would provide an interpreter if necessary or requested.
According to nurse Diane Spath, decedent's family first requested a translator *1007 the day before he died. In response, after contacting several ASL interpreters, she put the name and telephone number of an interpreter in a central location so that one could be called if a doctor needed to communicate with decedent when his family was not there. That same day, she arranged for a TTY/TDD to be installed at the nurse's station so that decedent's wife could call the Hospital staff from home. She also arranged for a closed-caption television to be installed in decedent's room.
However, Skyta said that her father had put his request for an interpreter in writing in September 1995, through Robert Queenan, a deaf friend who volunteered at the Hospital. In addition, Florence Sabo testified that when she visited decedent in the Hospital in September 1995, he told her that he wanted an interpreter. Sabo wrote the request down for him, and she gave the note to a nurse. She saw decedent ask a nurse for an interpreter and the nurse ignore him. Decedent also told Sabo that he wanted a TTY/TDD and a closed caption television because he was very lonesome, especially during the evening. Hall also testified that her father requested those devices.
Despite decedent's disability, Dr. David Cohen, decedent's cardiologist from 1987 to his death, testified that he was able to communicate with him. Cohen stated that they communicated in three ways: some lipreading and limited verbal responses; written notes; and through Shirley Potoczak Hall, who usually accompanied decedent on his doctor's visits. Even when Hall did not accompany decedent, Cohen was confident that he and his patient communicated satisfactorily. He observed that decedent's responses were sufficiently detailed to indicate that he understood what Cohen was saying.
Dr. Cohen testified that he visited his patient in the Hospital in 1995 and that nobody in decedent's family told him that decedent needed an interpreter or that their requests for one had been ignored. Decedent's daughters' testimony confirmed that they never discussed their father's need for an interpreter with his attending physician.
According to two registered nurses who treated decedent at Saint Joseph's, the staff used a "communication board" when his children were not there to interpret for him. The board has pictures that represent familiar complaints, such as difficulty breathing. Arturo Eijansantos commented in his nursing note for September 22, 1995, "Communicate[s] well through Sign Language and writing."
Decedent's daughters testified to the emotional distress they suffered due to having to serve as their father's interpreters. Skyta described the sorrow she felt about not doing a better job of interpreting for him and the unfairness of not being able to focus on providing emotional support. Hall described feeling helpless that she could not do a better job of interpreting for her father. She was forced to stay in the room during frightening procedures so that she could try to explain them to him. She limited what she told him because she did not want to worry him. Both daughters also testified to the strain it put on their relationship with their stepmother because they were unable to interpret adequately for her at the same time that they were trying to interpret for their father. Their stepmother became angry and distrustful, and by the time of trial, their formerly close relationship had been severed.
According to Shepard-Kegl, the three requirements of a qualified ASL interpreter are accuracy, confidentiality, and impartiality. It is best for the qualified interpreter *1008 to be someone with no vested interest in the proceedings. Impartiality was impossible for plaintiffs because they were upset by much of the information they had to interpret and they could not help trying to protect their father from the bad news. It was impossible for them to separate what they were interpreting from what they felt he should know, which denied him the right to make his own decisions. In Shepard-Kegl's opinion, decedent was not able to communicate effectively at the Hospital because he did not have a qualified interpreter.
The parties presented conflicting testimony on the Hospital's policy on providing interpreters. Queenan, decedent's deaf friend, had volunteered at the Hospital for eight years. He was not aware of anyone on staff who could sign well, nor had he ever known the Hospital to provide an ASL interpreter for a patient. Colleen Thomas, a deaf clerk who had worked at the Hospital for twenty years, had never seen any ASL interpreters in the Hospital. When she visited decedent during his September 1995 hospitalization, he asked her if she knew someone who could interpret for him. She said that she was not aware of anyone in the Hospital who could.
By contrast, James Pruden, chief of emergency services at Saint Joseph's,[4] said that his usual practice is to provide a translator through the Hospital's language pool for non-English-speaking patients whose family members do not want to interpret for them. He was not aware of any Saint Joseph's policy against providing an interpreter.
Similarly, the two nurses who treated decedent, Eijansantos and Spath, testified that there was no policy at the Hospital denying patients interpreters. Eijansantos said that he had never turned down a request for an ASL interpreter, but he also acknowledged that he had never received such a request. Spath, a nursing supervisor, said she had never received a complaint about a staff nurse for ignoring a request for an interpreter.
The jury also heard testimony on the Hospital's treatment of Maria Vindel, a deaf person with mental health problems. She had been admitted to Saint Joseph's in June 1997 and November 1998 and then discharged to Harbor House, a transitional group home operated by the Hospital for people with mental illness. Vindel testified that she asked for an interpreter at the Hospital and at Harbor House, but one had never been provided. Vindel taught a Harbor House employee, Daisy Rodriguez, some basic signs; but Rodriguez could not explain anything in depth and she was not always on duty when Vindel was there.
However, according to Josephine Carpenter, assistant director of Harbor House, Vindel had never requested an interpreter. Harbor House had sufficient resources and could have provided one. Furthermore, she testified that Saint Joseph's did not have a policy of denying deaf patients' requests for interpreters.
Rodriguez testified that Vindel had taught her to sign and she could communicate with Vindel on medical, social, and psychological concerns. She said that Vindel had never complained to her that her signing was inadequate and had never asked for an interpreter. Rodriguez was not aware of a Saint Joseph's policy to refuse an interpreter. Furthermore, Vindel attended Access, a day program run for deaf people with mental illness. According to Rodriguez, no one from Access had ever complained to her about Vindel's need for an interpreter.
*1009 Deborah Hartel, assistant vice-president for psychiatry at Saint Joseph's, discussed Vindel's discharge plan with staff from Access. The staff recommended safety devices such as a strobe light fire alarm; however, they suggested that Vindel needed only on-request rather than around-the-clock interpreters. Vindel never communicated to Hartel that she needed an interpreter. Hartel said that Saint Joseph's policy was to provide interpreters.

I
At the commencement of trial, Judge McVeigh ruled on a motion to limit the scope of plaintiffs' discrimination claims based on the statute of limitations. Plaintiffs' father died in January 1996; they filed their complaint on July 20, 1996. Plaintiffs sought compensatory and punitive damage for each hospitalization from 1987 until his death in January 1996. They argued that defendant's failure to provide an ASL interpreter for decedent on each hospitalization from 1987 was a continuing violation. Defendant argued that each hospitalization was a discrete event and the two-year statute of limitations should limit the complaint to hospitalizations after 1994. Judge McVeigh held that any claims based on hospitalizations before 1994 were barred by the statute of limitations. Furthermore, she ruled that notice was irrelevant and reference to the prior hospitalizations could inflame the jury.
Plaintiffs contend that the trial court erred in barring the claims based on decedent's pre-1994 hospitalizations due to the statute of limitations; they say that defendant's acts during the seven earlier admissions were not isolated incidents, but rather showed a pattern and policy of discrimination. Furthermore, according to plaintiffs, the court abused its discretion when it sua sponte reversed its earlier decision on the matter immediately before plaintiffs' counsel was to present her opening statement. Plaintiffs also contend that the court further abused its discretion when it ruled that evidence of those earlier hospitalizations was inadmissible due to its inflammatory nature.
Count One of the complaint alleged violations of the ADA, the RA, and LAD, all of which prohibit discrimination on the basis of disability. Judge McVeigh dismissed the ADA claims because the primary remedy available under Title II of that act is injunctive relief and such relief was inapplicable where plaintiffs' father was dead and thus did not have standing to request such relief. Although the trial proceeded on the RA claim, the LAD claim was never formally dismissed. For the purpose of this analysis, there are no significant distinctions between the RA and LAD claims.
The statute of limitations for claims asserted under the LAD is two years, based on New Jersey's personal injury statute of limitations. Montells v. Haynes, 133 N.J. 282, 286, 627 A.2d 654 (1993). Similarly, federal courts have ruled that the RA, as part of the "general corpus of discrimination law," which remedies injuries to personal rights, is governed by the state statute of limitations applicable to personal injury actions. Morse v. University of Vermont, 973 F.2d 122, 127 (2d Cir.1992). See also Downs v. Massachusetts Bay Transp. Auth., 13 F.Supp.2d 130, 136 (D.Mass.1998). Thus, Judge McVeigh properly ruled that the appropriate limitations period for an RA claim is two years. The complaint was filed on July 26, 1996; thus, claims based on conduct that occurred before July 26, 1994, would normally be barred.
The requirement that plaintiffs file a discrimination complaint within the *1010 statutory limitations period is subject to a judicially created equitable exception known as the "continuing violation" doctrine. Harel v. Rutgers, State Univ., 5 F.Supp.2d 246, 261 (D.N.J.1998), aff'd, 191 F.3d 444 (3d Cir.1999), cert. denied sub nom, Harel v. Lawrence, 528 U.S. 1117, 120 S. Ct. 936, 145 L. Ed.2d 814 (2000). Under that doctrine, a plaintiff may get relief for a time-barred act by linking it with an act within the limitations period if the acts can be treated as one continuous course of conduct that ends within the limitations period. Selan v. Kiley, 969 F.2d 560, 564 (7th Cir.1992). The purpose of the continuing violation doctrine is to permit a plaintiff to include acts "whose character as discriminatory acts was not apparent at the time they occurred." Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 446 (7th Cir.1994). New Jersey recognizes a similar "continuing tort doctrine" based on this federal doctrine. Wilson v. Wal-Mart Stores, 158 N.J. 263, 272, 729 A.2d 1006 (1999); Bolinger v. Bell Atl., 330 N.J.Super. 300, 306, 749 A.2d 857 (App. Div.), certif. denied, 165 N.J. 491, 758 A.2d 650 (2000).
To establish a continuing violation, a plaintiff must show that at least one discriminatory act occurred within the limitations period and that the discriminatory acts are part of a continuing pattern of discrimination rather than the " `occurrence of isolated or sporadic acts of intentional discrimination.' " Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 481 (3d Cir.1997) (quoting West v. Philadelphia Elec. Co., 45 F.3d 744, 755 (3rd Cir.1995)). The federal courts have recognized three theories of continuing violations: (1) cases involving hiring or promotion practices where the employer's decision-making process takes place over a period of time; (2) cases in which the defendant has an express, openly espoused policy that the plaintiff alleges is discriminatory ("systemic violations"); and (3) cases in which the plaintiff alleges that the defendant has followed a covert practice of discrimination ("serial violations"). Selan, supra, 969 F.2d at 565. In Bolinger, supra, 330 N.J.Super. at 306-07, 749 A.2d 857, this court condensed these theories into two categoriessystemic and serial violationsand pointed out that even those categories may at times merge; e.g., a series of sexually harassing acts by several supervisors that is considered part of a systemic policy of discrimination.
To assist the determination whether a plaintiff has demonstrated a continuing violation, the court in Berry v. Board of Supervisors of Louisiana State Univ., 715 F.2d 971, 981 (5th Cir.1983), articulated a three-factor analysis, which has been adopted by the United States Court of Appeals for the Third Circuit and by this court. Rush, supra, 113 F. 3d at 481; Bolinger, supra, 330 N.J.Super. at 307, 749 A.2d 857.
The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuous violation? The second is frequency. Are the alleged acts recurring... or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?
[Berry, supra, 715 F.2d at 981 (emphasisadded).]
*1011 The cases that most neatly fit into the continuing violation theory are those based on a hostile work environment: the acts of harassment continue over a period of time, but the individual acts are insufficient to constitute an actionable claim. Rush, supra, 113 F.3d at 482 (holding that a pattern of derogatory remarks, rude behavior, and other acts of sexual harassment constituted a continuing violation). See also Cornwell v. Robinson, 23 F.3d 694, 704 (2d Cir.1994) (holding that acts of race-and gender-based harassment constituted a continuing violation that did not end until the plaintiff was driven from her job); Anthony v. County of Sacramento, 898 F.Supp. 1435, 1446 (E.D.Cal.1995) (holding that racial and sexual slurs, racist cartoons, flyers, and graffiti over a five-year period and involving numerous perpetrators constituted a continuing violation); Wilson, supra, 158 N.J. at 274, 729 A.2d 1006 (holding that a supervisor's crude and indecent remarks and insistence that the plaintiff wear a brassiere could constitute an ongoing violation). In such cases, it is only with the benefit of hindsight, after numerous discriminatory acts, that a plaintiff may even realize that she is a victim of unlawful discrimination. Moskowitz v. Trustees of Purdue Univ., 5 F.3d 279, 281 (7th Cir.1993).
If, however, a plaintiff knew, or with the exercise of reasonable diligence should have known, that each act was discriminatory, the plaintiff "may not sit back and accumulate all the discriminatory acts and sue on all within the statutory period applicable to the last one." Id. at 282 (holding that an age-discrimination claim based on the denial of suitable laboratory space was actionable at the time it occurred and would not be considered part of later discriminatory conduct); Kidwell v. Board of Comm'rs of Shawnee County, 40 F.Supp.2d 1201, 1216 (D.Kan.) (holding that the denial of the plaintiff's request for transfer to a nonsmoking area was a discrete discriminatory act whose effects were apparent without further discrimination), aff'd, 189 F.3d 478 (10th Cir.1998), cert. denied, 528 U.S. 1064, 120 S.Ct. 620, 145 L. Ed.2d 514 (1999). See also Saylor v. Ridge, 989 F.Supp. 680, 687 (E.D.Pa. 1998) (holding that the denial of the plaintiff's request for a reasonable accommodation in the form of specialized computer equipment and compensation for work performed at home was actionable at the time it occurred).
Similarly, in Bolinger, supra, where a telephone company splicer was injured on the job, placed on disability at half-pay for seven years and told that he would be put on pension at half-pay when he turned sixty-two, and then returned to work as a repair service clerk, the court held that the plaintiff's removal from full-time status and placement on disability was a "discrete, permanent event that placed him on notice that his rights were being violated and triggered his duty to take legal action to recoup those rights." 330 N.J.Super. at 309, 749 A.2d 857. The court noted that the plaintiff's claim did not arise as the result of "continuously inflicted, albeit discrete and individual injuries that, taken together, comprised a single tortious act." Ibid. Rather, he had an actionable claim as soon as he was removed from his duties and placed on half-pay status; "[a]t that point, he experienced the full impact of his injury, although the amount of his actual damages may have continued to accrue the longer he remained on disability status." Ibid.
Here, plaintiffs alleged that during each of decedent's ten admissions to Saint Joseph's Hospital between 1987 and 1995, decedent and his family requested and were denied an ASL interpreter. They also allege that these denials were part of defendant's *1012 policy and pattern of refusing to accommodate deaf patients by providing qualified interpreters. Whether this is considered an overt or covert policy, thus constituting a systemic or a serial violation, is of little consequence. The threefactor analysis articulated in Berry, supra, 715 F.2d at 981, can be applied to either type of violation.
Plaintiffs allege facts that easily satisfy the first two factors of the Berry analysis (subject matter and frequency), but not the third (permanence). The subject matter of each alleged discriminatory act was identicalthe denial of decedent's request for an interpreter when he was hospitalized. The ten acts of alleged discrimination over the course of nine years went well beyond the frequency of the acts found by courts to be too few and isolated to be continuing violations. See, e.g., Selan, supra, 969 F.2d at 567 (two acts separated by a two-year gap); Harel, supra, 5 F.Supp.2d at 262 (two acts in nine years). However, the initial denial of decedent's request for an interpreter had a degree of permanence that should have triggered his assertion of his rights under the RA.[5] Each subsequent denial should have done the same. The purpose of the ongoing violation doctrineto permit a plaintiff to include acts whose character as discriminatory acts was not apparent at the time they occurredis not served by applying it to these circumstances.
Having concluded that Judge McVeigh properly limited plaintiffs' disability discrimination claims to the final two hospitalizations, we examine the timing of the ruling. We reject plaintiffs' argument that the trial judge's ruling immediately preceding the presentation of opening statements irreparably prejudiced the presentation of plaintiffs' case. The record does not support plaintiffs' characterization of the ruling as a reversal of a prior ruling. Our review of the transcripts reveals that after the initial argument of the motion, Judge McVeigh did nothing more than provide a sketchy indication of her leanings on the statute of limitations issue. Furthermore, in several instances prior to her actual ruling, she mentioned that she was troubled by the issue. Indeed, she asked for additional briefing and repeatedly advised counsel that she was still reading cases and considering the issue. Thus, both counsel were aware at the commencement of this trial that a fundamental motion remained unresolved and the disposition of that motion would require each of them to alter their case plan. Furthermore, Judge McVeigh provided plaintiffs' trial counsel time during the course of the trial to react to the ruling. While one party was likely to be disappointed by the trial judge's ruling, neither party could have reasonably approached this trial with any assurance that its position on the statute of limitations issue would prevail. Under these circumstances, we discern no prejudice by the timing of the disposition of this motion.

II
In addition to rejecting plaintiffs' argument that the ten hospitalizations over nine years constituted a continuing violation of decedent's rights, Judge McVeigh also barred reference to events which occurred during the prior seven hospitalizations. Plaintiffs argued that this evidence was relevant to the issue of notice and also established a pattern and practice of *1013 discriminatory conduct to hearing impaired patients. We disagree.
In a reasonable accommodation case under the LAD or the RA, plaintiffs need not prove discriminatory animus on the part of a defendant but only that it failed to provide an accommodation and it knew this might violate the LAD or the RA. Proctor v. Prince George's Hosp. Ctr., 32 F.Supp.2d 820, 829 (D.Md.1998). Furthermore, the RA does not require provision of interpreters but only the assurance of effective communication. Id. at 827.
Here, plaintiffs sought to admit evidence that their father had asked for an interpreter during past hospitalizations and none had been provided. This testimony was not needed to establish notice to defendant because notice is not an element of their claim. Nevertheless, the trial judge allowed plaintiffs to submit evidence that their father had requested an interpreter and had not received an interpreter during his initial hospitalization in 1987 and also allowed testimony that defendant was aware of its obligations.
Judge McVeigh was clearly concerned that the admission of evidence concerning time-barred claims could undermine her ruling that each hospitalization in which an ASL interpreter was not supplied constituted a separate and distinct event. She feared admission of this evidence could confuse the jury. We cannot dismiss this concern. The evidence plaintiffs sought to introduce was essentially the same testimony as plaintiffs presented concerning their father's September 1995 and December 1995-January 1996 hospitalizations. It could not reasonably be characterized as evidence of time-barred actions which provide background to understand non-time-barred claims. See Mathewson v. National Automatic Tool Co., 807 F.2d 87, 91 (7th Cir.1986).
Plaintiffs were also able to introduce testimony of the Hospital's knowledge of its responsibilities. Priscilla Skyta testified that the Patients' Bill of Rights was posted in her father's Hospital room and declared that a patient was entitled to clear communication and an interpreter would be provided if necessary or requested.
To be sure, Judge McVeigh restricted other witnesses from testifying about timebarred events; yet we do not consider these rulings an abuse of her discretion to control and manage the introduction of testimony. Bosze v. Metropolitan Life Ins. Co., 1 N.J. 5, 10-11, 61 A.2d 499 (1948); Marion v. Public Serv. Elec. & Gas Co., 72 N.J.Super. 146, 178 A.2d 57 (1962). In fact, in most instances the testimony was barred because it lacked a proper foundation or defendant had not been notified of this aspect of a witness's testimony. For example, Robert Sabo and his wife were barred from testifying about their experiences at the same Hospital in 1989. This testimony was barred because defendant had been advised that their testimony would be limited to their knowledge of decedent's and his daughters' communication skills and their observations of decedent during the September 1995 hospitalization. Queenan's testimony concerning delivery of a copy of the disability statutes to Hospital personnel was excluded as irrelevant and possibly cumulative because plaintiffs had submitted evidence that decedent had registered a prior complaint about his difficulties and that the Hospital knew of its obligations to patients such as decedent.

III
Plaintiffs contend that the trial judge erred in failing to instruct the jury that defendant had the burden of proving that it reasonably accommodated decedent.
*1014 They also contend that the error was exacerbated by the submission of a confusing interrogatory. We disagree.
Under the RA, plaintiffs had the burden of establishing a prima facie case: 1) that their father was disabled; 2) that he was eligible for treatment at the Hospital; 3) that he was denied the opportunity to understand his treatment and fully participate in his treatment due to his disability; and 4) that the Hospital received federal assistance. Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 722 (2d Cir.1994), cert. denied, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995); Doherty v. Southern College of Optometry, 862 F.2d 570, 573 (6th Cir.1988), cert. denied, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989); Mayberry v. Von Valtier, 843 F.Supp. 1160, 1167 (E.D.Mich.1994). Here, the only disputed issue was the decedent's ability to effectively communicate with the Hospital staff.
Once plaintiffs established a prima facie case of discrimination, the focus shifted to defendant's reasons for withholding the benefit. Woolfolk v. Duncan, 872 F.Supp. 1381, 1389-90 (E.D.Pa.1995). As with other discrimination cases, once the defendant has justified or explained its conduct, plaintiff has the opportunity to rebut the evidence presented by defendant. Carter v. Bennett, 840 F.2d 63, 65-66 (D.C.Cir.1988).
This scheme is an adaptation of the model employed in employment discrimination cases. The Supreme Court outlined a model for analyzing cases brought under Title VII, 42 U.S.C.A. § 2000e, which provides that the burden of proof remains with the plaintiff but also provides that once the plaintiff establishes a prima facie case the burden of production of evidence shifts to the defendant to articulate a nondiscriminatory reason for the adverse action taken against the plaintiff. Once defendant does so, plaintiff may present evidence to rebut defendant's position. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677-78 (1973); see also Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253-55, 101 S.Ct. 1089, 1094-95, 67 L. Ed.2d 207, 215-17 (1981).
Here, plaintiffs argue that the trial judge erred by advising the jury that they retained the burden of proof on each issue throughout the case. They contend that once they established their prima facie case, the burden of proof shifted to defendant and that the judge erred in not informing the jury of defendant's proof obligations. Although we acknowledge that some cases suggest that the burden of proof does shift to defendant to counter a prima facie case of lack of reasonable accommodation to a disability, a close reading of these cases suggests that whether the defendant assumes a burden of production or a burden of proof on a specific issue depends on the nature of the defense.
If a defendant's response to a reasonable accommodation claim is that that accommodation would be unduly burdensome or an undue hardship, this defense is considered an affirmative defense and the defendant assumes the burden of proof on this issue. Monette v. Electronic Data Sys. Corp., 90 F.3d 1173, 1177-85 (6th Cir.1996); Carter, supra, 840 F.2d at 65-66; Prewitt v. United Postal Serv., 662 F.2d 292, 307 (5th Cir.1981). If, however, the defense is that an alternative effective means of communication was used, the burden of proof does not shift. Petersen v. Hastings Pub. Schs., 831 F.Supp. 742, 753 (D.Neb.1993), aff'd, 31 F.3d 705 (8th Cir. 1994).
Here, defendant never argued that a reasonable accommodation was not possible or unduly burdensome. It argued that decedent was able to effectively communicate *1015 with staff throughout the September and December 1995 hospitalizations.[6] Accordingly, Judge McVeigh properly assigned the burden of proof to plaintiffs and the interrogatories were properly phrased. Moreover, this charge, unlike the charge discussed by this court in Borngesser v. Jersey Shore Med. Ctr., 340 N.J.Super. 369, 774 A.2d 615 (App.Div.2001), properly focused throughout on the sole issue of effective communication.

IV
Plaintiffs' arguments concerning other evidentiary rulings (Points Four, Five and Six) and bias by the trial judge (Point Ten) are without sufficient merit or precedential value to warrant discussion in a written opinion. R. 2:11 3(e)(1)(E).
Affirmed.
NOTES
[1] Plaintiffs Hall, Skyta and Paul Potoczak are the adult children of Leon Potoczak; Rozelle Potoczak was the wife of Leon Potoczak and the stepmother of his children. At sometime prior to trial, Rozelle Potoczak withdrew as a plaintiff.
[2] The RA has been interpreted to prohibit discrimination against nondisabled persons based on their association with a person with a disability and to allow their claims if they have suffered a distinct and palpable injury of their own. United States v. City of Charlotte, 904 F.Supp. 482, 486 (W.D.N.C.1995).
[3] Plaintiffs do not assert any claim questioning the quality of the medical care provided to their father.
[4] Pruden did not recall ever treating the decedent.
[5] The ADA did not go into effect until 1990, but the RA has been in effect since 1973. Cases on the denial of interpreters for hearing impaired people have been published since at least 1990. Rothschild v. Grottenthaler, 907 F.2d 286 (2d Cir.1990).
[6] To the extent that plaintiffs contend that Judge McVeigh should have explicitly informed the jury of the McDonnell Douglas-Burdine analytical framework, we find no error. Appellate courts have instructed trial courts that a jury need not be informed of the finer points of the McDonnell Douglas-Burdine paradigm. See Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 347-48 n. 1 (3d Cir.1999).