804 A.2d 1193 (2002)
354 N.J. Super. 111
Karen CAGGIANO, Plaintiff-Appellant/Cross-Respondent,
v.
Armando B. FONTOURA, Essex County Sheriff, individually and in his official capacity, The State of New Jersey, The County of Essex, Office of the Sheriff of Essex County a/k/a Essex County Sheriff's Office, Defendants-Respondents, and
Robert LeFrancis, individually and in his official capacity, and Ronald Tutela, individually and in his official capacity, Defendants-Respondents/Cross-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued March 27, 2002.
Decided July 25, 2002.
*1195 Nancy Erika Smith, Montclair, argued the cause for appellant/cross-respondent (Smith Mullin, attorneys; Ms. Smith, of counsel and on the brief; Kelly A. Smith, on the brief).
Rosemary Alito, Newark, argued the cause for respondents County of Essex, Office of the Sheriff of Essex County and Armando B. Fontoura (McCarter & English, attorneys; Ms. Alito, of counsel and on the brief; Vincent N. Avallone, on the brief).
Larry R. Etzweiler, Senior Deputy Attorney General, argued the cause for respondent State of New Jersey (David Samson, Attorney General, attorney; Patrick DeAlmeida, Deputy Attorney General, of counsel; Larry R. Etzweiler, Senior Deputy Attorney General, on the brief).
Andrew I. Indeck, Bedminster, argued the cause for defendants/cross-appellants, Robert LeFrancis and Ronald Tutela (Scarinci & Hollenbeck, attorneys; Steven B. Harz, of counsel; Esther Suarez, on the brief).
Before Judges KING, CUFF and WECKER.
*1194 The opinion of the court was delivered by WECKER, J.A.D.
Plaintiff appeals from summary judgment dismissing two of the three counts of her complaint under the New Jersey Law Against Discrimination (LAD) as untimely under the applicable two-year statute of limitations.[1] The main issue presented is whether a complaint alleging a hostile work environment created by a series of acts and incidents, all but the last of which occurred more than two years before plaintiff filed her complaint, should be deemed timely as a continuing violation. The United States Supreme Court recently answered this very question in the affirmative in a case arising under Title VII, involving racially motivated harassment in the workplace. National Railroad Passenger Corp. v. Morgan, ___ U.S. ___, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). As we shall explain, we deny defendants' motions to dismiss plaintiff's appeal as interlocutory, and grant leave nunc pro tunc. We conclude that plaintiff's complaint was timely filed, and we therefore reverse summary judgments dismissing her complaint against all defendants other than the State. We also affirm summary judgment dismissing certain individual defendants' counterclaims against plaintiff.

I.
Plaintiff, Karen Caggiano, is an Essex County Sheriff's officer. Defendants are Armando B. Fontoura, individually and in his official capacity as the Essex County Sheriff, the County of Essex, the Office of the Sheriff of Essex County, the State of New Jersey, Robert LeFrancis, a captain *1196 in the Sheriff's office, and Ronald Tutela,[2] a Sheriff's officer. We will refer to Fontoura, Essex County, and the office of the Sheriff collectively as the County defendants.
Plaintiff filed a three-count complaint alleging: (1) harassment and discrimination by all defendants based on plaintiff's gender and sexual orientation in violation of the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49 (count one)[3]; (2) retaliation by the State and County defendants by being forced to write a report regarding allegations of gender and sexual orientation harassment and discrimination[4] (count two); and (3) negligence by all defendants for failing to have in place well-publicized and enforced anti-discrimination and anti-harassment policies, effective formal and informal complaint structures, training, and monitoring mechanisms (count three). LeFrancis and Tutela filed counterclaims for defamation and malicious abuse of process and a cross-claim against Essex County for indemnification. The County defendants brought cross-claims against the State seeking indemnification and representation.
The Law Division judge granted summary judgment dismissing all claims against the State, LeFrancis, and Tutela; partial summary judgment dismissing counts one and three of the complaint against the County defendants; and summary judgment dismissing LeFrancis's and Tutela's counterclaims. Those decisions are reflected in four separate orders signed on September 21, 2000:
(1) granting the State's motion to dismiss plaintiff's complaint against the State and to dismiss the County defendants' cross-claims for indemnification by the State and legal representation of the County defendants by the State (order # 1);[5]
(2) granting LeFrancis and Tutela's motion for summary judgment dismissing plaintiff's complaint against them (order #2);
(3) granting the County defendants' motion for partial summary judgment dismissing counts 1 and 3 of plaintiff's complaint (order # 3); and
(4) granting plaintiff's motion to dismiss LeFrancis and Tutela's counterclaims (order # 4).
The judge substantially granted plaintiff's request to voluntarily dismiss the remaining count two of her complaint (alleging retaliation) and provided by order that plaintiff would be permitted to refile that count as timely within thirty days of a successful disposition of her anticipated appeal of the dismissal of counts one and three.

II.
Viewing the record in the light most favorable to the party opposing summary judgment, as we must, these are the facts. On August 2, 1993, plaintiff began work as a Sheriff's officer in Essex County. She attended an orientation program and received a County of Essex Employee Handbook. *1197 Her first position was in the transportation department, where her job was to transport prisoners back and forth from the Essex County Jail Annex in Caldwell for court dates and for medical treatment and to deliver prisoners from State institutions back to County facilities. When not on the road, she worked moving prisoners back and forth between the jail and the holding area for prisoners' court appearances. Plaintiff did this work until December 15, 1997, when she was transferred as a result of the incidents that form the basis for her complaint.
Plaintiff claims that the first incident of harassment took place in or about 1995. While plaintiff was eating at a table in the large room that was both the locker room and the lunch room, Sheriff's Officer Frank Guardabascio said to her, "hey, Kar, what are you eating, snapper for lunch?"
A few months later, while eating lunch, somebody asked plaintiff what she was eating. When she replied that she was eating a potato and egg sandwich, Guardabascio said, "oh, that's right, you don't do the meat." Also in 1995, while plaintiff was standing at the key desk talking to Officer Rocco Romeo, Guardabascio called her "butch," and said "what's the matter, dike, the truth hurts?" Plaintiff slapped him. Guardabascio later apologized to her.
In 1994 or 1995, LeFrancis questioned plaintiff about her knowledge of a gay bar in New York City called Stonewall and about Gloria Steinhem. Plaintiff was offended because she had not told LeFrancis that she was gay and questioned why he was asking her about a gay bar while others were present.
Twice in either 1995 or 1996, plaintiff found "women seeking women" advertisements from a newspaper taped to the outside of her locker. She immediately ripped them down and threw them in the garbage. Plaintiff also remembered that some officers made derogatory comments about gay prisoners but she could not give any details as to who made the remarks or when they were made.
On one occasion, Sheriff's Officer Michael Birmingham offered to lend an adult film to other officers, stating that there were a lot of women on women in it, and adding, "hey, Kar, you'll like this one. You want to watch it?" Plaintiff was disturbed because LeFrancis just laughed and walked away. She thought that she had complained to Joe LeFrank of the Policeman's Benevolent Association (PBA) about this incident. The date of this incident is unknown.
Plaintiff saw Playboy pictures with breasts and buttocks taped to the inside of other officers' open locker doors in the lunch and locker room, and stated that she may have complained to LeFrancis about them in 1995 or 1996. She complained to Sergeant Tommy Colucci, but he said it was a matter of interpretation and that such things were art to some people. LeFrancis told plaintiff that this was "a men's workplace. If you don't like it, go be a secretary somewhere."
In 1996, she asked LeFrancis to move her to an earlier shift, and he responded that "when you have kids, then I'll give you earlier hours." She found this offensive because the selection of hours was based on seniority, and it was harassment to say this to a "gay girl." In July 1997, when LeFrancis learned that plaintiff was offered a job as a patrol officer with the Newark Police Department, he told her, "well, your kind does okay on the street."
Between July and September 1997, Tutela exposed his penis to plaintiff on *1198 four or five occasions, and said things like, "hey, Kar, look at this. Or, isn't this pretty? Don't you want some of this? Let me ram this up your a* *."[6] In the period May through September 1997, Tutela said other sexual things to plaintiff without exposing himself. He said "he wanted to ... f* * * me up the a* * and how he wanted to bite my tits," and "come on, meet me at the hotel, we can f* * * all night. Come on, I'll f* * * you up your a* *, I'll eat you, I want to put my fingers up your a* * while I'm eating you."
At some point between May and September 1997, plaintiff complained to LeFrancis and to LeFrank about Tutela's conduct and comments. LeFrancis told her that Tutela used to be much worse the first time he was in the transportation department, but now he was much calmer. LeFrank told plaintiff she could file a grievance, but she did not; instead she asked LeFrank to talk to Tutela about his behavior.
On December 3, 1997, plaintiff was speaking to Officer Restaino, and he asked her if it was true that Tutela had exposed his genitals, and she told him that it happened all the time. Plaintiff's partner, Frank Thompson, agreed that Tutela always had his genitals out of his pants. Captain Nicholas Salvato, who was about ten feet away, heard the conversation. The next day, December 4, Salvato instructed plaintiff to write down everything she had told him the previous day. Plaintiff said she did not want to do so, because she needed the job and if she did so, she would be labeled as a rat. She explained that her safety would be in jeopardy, because when a fight breaks out, an officer needs immediate reinforcement. Salvato told her that he would make it easy for her by ordering her to write the report. She consulted with the PBA and with a friend who is a judge, and was advised that she had to write the report. The next morning Salvato told her that he had already written a two-page report to Internal Affairs, so she had to submit her report.
On December 5, 1997, plaintiff wrote the following:
I am issuing this report under the direct order of Capt. Nicholas Salvato. I have been ordered to detail the incidents involving Officer Ron Tutella pertaining to sexual harassment on the job. These incidents include but are not limited to the following.

The said officer on several occasions had taken his penis from his pants and waived it about making comments to the effect "Look how pretty this is and come on Kar just touch it." "Kar can you take all of this."
He has also said to me "I want to f* * * you in the a* *," "I want to bite your tits". "Let me eat you[.]"
At various times the officer would say your [sic] not going to charge me are you Kar.
Although I have not complained to Capt[.] LeFrancis he is aware of this behavior having been present on several occasions.
Because of my fear of reprisal I have been forced to continue to subject myself to this conduct. I need my job but this conduct can no longer be tolerated.

[Emphasis added.]
This was plaintiff's first formal, written report of harassment. After submitting *1199 the report, personnel from Internal Affairs interviewed plaintiff on three separate days.
After plaintiff wrote and submitted her report on December 5, 1997, no similar incidents occurred, except for February 11, 1998, when plaintiff was assigned to a training class. On December 15, 1997, the day Fontoura found out about plaintiff's complaints of sexual harassment, he transferred the individuals who allegedly engaged in the inappropriate conduct. On the same day, Fontoura told plaintiff that she could be transferred anywhere she wanted to go. After being shunned by other officers, three days later plaintiff's attorney asked that plaintiff be moved, and she was transferred to work in the courtrooms in the Gibraltar Building.
On February 11, 1998, plaintiff was assigned to the same sexual harassment training class as Guardabascio. Plaintiff stated that she thought it was odd that if there were approximately 400 officers, with twelve to fifteen in a class, that Guardabascio would be placed in the same class with her. When Sheriff Fontoura came into the class, he told the officers, "remember, guys, harass is one word, ha, ha, ha".
Plaintiff had kept a daily planner in her shirt pocket since 1994 and made notations in the planner when incidents of harassment occurred, when something at work upset her, or if something important occurred. Plaintiff's daily planner for 1998, which included pages for November and December 1997 shows no entries for those months relating to harassment. She testified at her deposition that she may have written items in her 1997 planner, and even if nothing was written down, incidents may have happened. She did not recall any specific events in November or December 1997.
Robert LeFrancis wrote an affidavit, dated May 11, 2000, stating that he had been employed in the Essex County Sheriff's office from December 18, 1967, to July 1, 1999, but had worked in Essex County on only six days in November 1997November 6, 10, 14, 17, and 18and had had no contact with plaintiff after November 18, 1997. On approximately November 19, 1997, LeFrancis went to Ohio and returned to work on December 11, 1997, when he was reassigned to the courts.
The County maintained an Employee Handbook, which contained the following:
It is the policy of the County of Essex to ensure equal employment opportunity for all persons, regardless of race, color, creed, national origin, political or religious opinions or affiliations, ancestry, age, marital status, sex or because of a disability that does not interfere with the ability to do the work required, or liability for service in the Armed Forces of the United States.
This policy shall be applied to all phases of employment such as recruitment, selection, appointment, placement, promotion, demotion, transfer, training, wages, benefits, working conditions, such personnel actions as layoff, recall, discharge, disciplinary action, performance evaluation and use of all County facilities.
Under the section titled "Discriminatory Complaint Process," the Handbook provides:
A discrimination complaint may arise from any combination of circumstances, actions, policies, or decisions which appear to create a non job related distinction and differential treatment on the basis of race, color, religion, sex, national origin, age or disability. Any employee *1200 who feels that he/she has been discriminated against with regard to any phase of his/her employment may present and process a discrimination complaint to their [sic] immediate supervisor and Affirmative Action Officer, in writing, within ten days of the occurrence.
Participation in the Discriminatory Complaint Process no way abridges employee rights with regard to union contract grievance procedures or actions by the New Jersey Commission on Civil Rights, New Jersey Department of Personnel, or the United States Equal Employment Opportunity Commission.
Under the section on "Sexual Harassment Policy," the Handbook states:
It is County policy that all employees are responsible for assuring that the workplace is free from harassment, including sexual harassment. All employees must avoid any action or conduct which could be viewed as sexual harassment, including:
1. Unwelcomed sexual advances[;]
2. Requests for sexual acts or favors; [and]
3. Other verbal, written or physical conduct of a harassing nature. Employees who have a complaint of harassment, including sexual harassment, shall bring their complaint to a supervisor and/or the Office of Affirmative Action, as soon as possible.
General Order No. 95-3 of the Office of the Sheriff of Essex County, dated August 24, 1995, and effective August 30, 1995, addresses sexual harassment. This order set forth a department policy to handle allegations of sexual harassment and purported to establish procedures for reporting, investigating, and resolving complaints of sexual harassment in the workplace. "Any employee who believes she or he has been the victim of sexually harassing activity in the workplace ... is encouraged to report the violation verbally, and in writing" to either her or his supervisor, the personnel officer or assistant personnel officer, the internal affairs unit, the chief, or the sheriff. "Any employee encountering sexual harassment shall inform the person that such actions are unwelcome and offensive. If the practice persists, the employee shall report the incident verbally, and in writing immediately".
The Essex County Sexual Harassment Policy, originally issued on April 25, 1989, and effective May 10, 1989, also sets forth a definition of sexual harassment, a procedure for bringing claims, and examples of conduct to be avoided.[7]

III.
We first address defendants' contentions that plaintiff's appeal should be dismissed as interlocutory. At argument on plaintiff's motion to dismiss count two without prejudice, the judge ruled:
This Court grants the plaintiff's motion on the grounds of judicial efficiency and economy, and also based on fairness. Simply no reason why, it appears to this Court, that the matter should proceed on Count 2 alone when the appeal on Count 1 and Count 3 looms into the future.
I agree with the plaintiff's position in that granting the motion will permit the *1201 plaintiff to file a single notice of appeal for her case, rather than multiple notices for different claims at different times. Accordingly, I will sign an appropriate order.
The order issued on that date includes a final provision: "This Order constitutes a final Order for purposes of appeal."
An appeal may be taken only from a final judgment, R. 2:2-3(a)(1), and a judgment is final only if it is final both as to all issues and all parties. Lawler v. Isaac, 249 N.J.Super. 11, 17, 592 A.2d 1 (App.Div.1991):
While a voluntary dismissal may be a judgment, it is not necessarily a final judgment. The additional inquiry must be whether the stipulation of dismissal ended the case on all issues as to all parties. Where additional parties remain in the case, relief from a dismissal, whether by stipulation or otherwise, must be sought pursuant to R. 4:42-2.

[Ibid.]
See also Pressler, Current N.J. Court Rules, comment 2 on R. 2:2-3 (2001) ("Pressler") ("If [the order] is not final, respondent on the appeal has the responsibility to move for its dismissal, but in any case, it will be dismissed by the court unless in the interests of justice it grants leave to appeal nunc pro tunc...."). R. 4:42-2, as amended in 1986, provides that finality certification is available only for interlocutory orders which, if final, "would be subject to process to enforce a judgment pursuant to R. 4:59." Thus, "[t]his limited eligibility excludes ... the whole panoply of orders which, if final, would confer no enforcement rights under R. 4:59." Pressler, comment on R. 4:42-2; see, e.g., Fu v. Fu, 309 N.J.Super. 435, 439-40, 707 A.2d 473 (App.Div.1998), rev'd on other grounds, 160 N.J. 108, 733 A.2d 1133 (1999).
The Appellate Division may grant leave to appeal in the "interest of justice." R. 2:2-4. "[I]n extraordinary circumstances and in the public interest leave will be granted nunc pro tunc where the appellant filed a notice of appeal rather than a required motion for leave." Pressler, comment on R. 2:2-4.
In CPC Int'l, Inc. v. Hartford Accident & Indem. Co., 316 N.J.Super. 351, 366, 720 A.2d 408 (App.Div.1998), certif. denied, 158 N.J. 73, 74, 726 A.2d 937 (1999), we said: "[T]he voluntary dismissal rule, R. 4:37-1(b), should not be used to transmogrify an interlocutory order into a final judgment for the purpose of affording an opportunity to appeal as of right." Our comments in CPC, which arose in a similar procedural posture, are particularly relevant:
[W]e note that the Law Division's summary judgment order in this appeal would have been interlocutory but for its dismissal of CPC's claims regarding remediation costs of the other three sites. The dismissal of these claims was "without prejudice." We harbor the distinct impression that they will be reinstated following our opinion in this case, and that the dismissal without prejudice constituted an artifice to foist jurisdiction upon this court.
The questions presented by this appeal are substantial and require prompt disposition.

[Id. at 365-66, 720 A.2d 408.]
In Tradesoft Technologies, Inc. v. Franklin Mutual Insurance Co., 329 N.J.Super. 137, 141, 746 A.2d 1078 (App.Div.2000), we said:
We have repeatedly held that piecemeal appeals are ordinarily contrary to *1202 the fair and expeditious conclusion of litigation; that the determination of whether the interests of the litigants and the judicial process otherwise requires can only be made by this court on a motion for leave to appeal properly brought pursuant to R. 2:5-6; and that the calendar of this court is not subject to the control of the trial court by way of an improvident finality certification.
In fact, the orders appealed from were interlocutory, and plaintiff should have sought leave to appeal. We disapprove of any attempt by a trial judge, no matter how well-meaning, to preempt our authority to decide whether to hear an interlocutory appeal. Nevertheless, because this case involves serious allegations concerning the conduct of a law enforcement agency, and to forestall further delay in addressing the substance of those claims, we grant leave nunc pro tunc. We conclude here, as we did in Tradesoft, 329 N.J.Super. at 141, 746 A.2d 1078, that:
While we have the option ... of simply dismissing this appeal as having been taken from an improvidently certified order, see, e.g., Hallowell v. Am. Honda Motor Co., Inc., 297 N.J.Super. 314, 318, 688 A.2d 110 (App.Div.1997), we have nevertheless elected to grant leave to appeal nunc pro tunc in the interest of substantial justice, particularly because of the inevitable effect of the order[s] appealed from on the remaining claim[s].

IV.
There is no doubt that plaintiff's allegations, if timely, set forth an actionable, prima facie case of hostile work environment in violation of LAD, as the elements of such a claim have been defined in Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 626 A.2d 445 (1993) (supervisor's repeated conduct toward employee consisting of offensive sexual comments and touching created a hostile work environment).
To state a claim for hostile work environment sexual harassment, a female plaintiff must allege conduct that occurred because of her sex and that a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive working environment. For the purposes of establishing and examining a cause of action, the test can be broken down into four prongs: the complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a(3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.

[Id. at 603-04, 626 A.2d 445.]
An actionable claim under LAD based upon a hostile work environment frequently arises out of repeated incidents that take place over time and by their cumulative effect make it unreasonable and unhealthy for the plaintiff to remain in that work environment. See, e.g., Wilson v. Wal-Mart Stores, 158 N.J. 263, 729 A.2d 1006 (1999) (male supervisor's repeated, crude, indecent comments to female employee); Mancini v. Township of Teaneck, 349 N.J.Super. 527, 794 A.2d 185 (App.Div.2002) (police captain and other male officers subjected first female officer to degrading sexual conduct over period of years); Kelly v. Bally's Grand, Inc., 285 N.J.Super. 422, 667 A.2d 355 (App.Div.1995) (sixty-four-year-old plaintiff was subjected to numerous "age based statements *1203 of bias"); Zalewski v. Overlook Hosp., 300 N.J.Super. 202, 692 A.2d 131 (Law Div.1996) (heterosexual male employee who was subjected to repeated comments and conduct by coworkers based upon gender stereotyping had an actionable hostile work environment claim); see also Blakey v. Continental Airlines, Inc., 164 N.J. 38, 751 A.2d 538 (2000) (male pilots repeatedly used work-related online forum to communicate negative comments aimed at female pilot who had previously won a federal sexual harassment case against the airline).[8]

V.

A.
There is no dispute that discrimination claims under LAD, including claims alleging a hostile work environment, are subject to a two-year statute of limitations. Montells v. Haynes, 133 N.J. 282, 294-95, 627 A.2d 654 (1993). However, New Jersey courts have adopted the continuing violation concept, analogous to the continuing tort doctrine applied in other contexts, to permit recovery for the entire pattern of conduct that cumulates in a hostile environment, despite the fact that some of that conduct occurred outside the otherwise applicable limitations period. See Wilson v. Wal-Mart Stores, 158 N.J. at 266, 729 A.2d 1006 (1999) (where "both predecessor and successor employers are alleged to have contributed to the creation of a hostile work environment," timeliness of claim against predecessor "hinges in part on the continuing tort doctrine"); Mancini v. Township of Teaneck, 349 N.J.Super. at 556-60, 794 A.2d 185; Shepherd v. Hunterdon Developmental Ctr., 336 N.J.Super. 395, 411-15, 765 A.2d 217 (App.Div.2001) (allegations of excessively close supervision, absence of social contact, express and implied threats and disciplinary charges beginning when plaintiffs testified in support of co-employees' racial discrimination case and extending over more than two years); cf. Terry v. Mercer County Bd. of Chosen Freeholders, 173 N.J.Super. 249, 253, 414 A.2d 30 (App.Div.1980) (in context of discrimination in salary and work conditions, allowing damages for period beyond 180 days within which claims can be filed in the Division on Civil Rights), modified on other grounds, 86 N.J. 141, 430 A.2d 194 (1981); Decker v. Board of Educ. of Elizabeth, 153 N.J.Super. 470, 473-75, 380 A.2d 285 (App.Div.1977) (recognizing sex discrimination in pay as a continuing violation), certif. denied, 75 N.J. 612, 384 A.2d 842 (1978).
In two recent cases where we found no continuing violation on the facts, we nevertheless recognized the viability of the "judicially created doctrine ... as an equitable exception to the statute of limitations." Bolinger v. Bell Atlantic, 330 N.J.Super. 300, 306, 749 A.2d 857 (App.Div.), certif. denied, 165 N.J. 491, 758 A.2d 650 (2000); see also Hall v. St. Joseph's Hosp., 343 N.J.Super. 88, 102-05, 777 A.2d 1002 (App.Div.2001) ("The cases that most neatly fit into the continuing violation theory are *1204 those based on a hostile work environment...." Id. at 102, 777 A.2d 1002), certif. denied, 171 N.J. 336, 793 A.2d 715 (2002).

B.
It is precisely because a hostile work environment generally arises out of a cumulation of offensive acts or communications that the timeliness of complaints alleging such a cause of action has been problematic. In particular, despite general recognition of the continuing violation doctrine, courts have disagreed on its application as an exception to the statute of limitations. A divided United States Supreme Court recently resolved a conflict among the circuits on the application of the doctrine in the context of a racial discrimination claim under Title VII.
In National Railroad Passenger Corp. v. Morgan, ___ U.S. ___, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), a majority held that a hostile work environment claim under Title VII "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." ___ U.S. at ___, 122 S.Ct. at 2077, 153 L.Ed.2d at 128. While the Court held that discrete acts of discrimination cannot be revived based upon other similar discrete acts that are timely, the Court also distinguished hostile environment claims from discrimination claims based upon such "acts such as termination, failure to promote, denial of transfer, or refusal to hire." The Court found that hostile work environment claims differ from such discrete discrimination claims because the "very nature [of a hostile environment claim] involves repeated conduct." ___ U.S. at ___, 122 S.Ct. at 2073, 153 L.Ed.2d at 123 (citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 348-49 (3d ed. 1996) ("Lindemann")). Although the Court reversed the Ninth Circuit's decision allowing Wilson to bring discrete discrimination claims for conduct that began beyond the applicable limitations period, the Court affirmed the Circuit with respect to Morgan's hostile environment claim.
Writing for the majority, Justice Thomas explained: "A hostile work environment claim is comprised of a series of separate acts that collectively constitute one `unlawful employment practice.' 42 U.S.C. § 2000e-5(e)(1)." Morgan, ___ U.S. at ___, 122 S.Ct. at 2074, 153 L.Ed.2d at 124. In Morgan, the majority explicitly rejected the Fifth Circuit's "multifactor test," Berry v. Bd. of Supervisors, 715 F.2d 971, 981 (5th Cir.1983), which would take into account "(1) whether the alleged acts involve the same type of discrimination; (2) whether the incidents are recurring or independent and isolated events; and (3) whether the earlier acts have sufficient permanency to trigger the employee's awareness of and duty to challenge the alleged violation." Morgan, ___ U.S. at ___ n. 3, 122 S.Ct. at 2069 n. 3, 153 L.Ed.2d at 118 n. 3. The majority in Morgan also rejected the Seventh Circuit's holding in Galloway v. General Motors Service Parts Operations, 78 F.3d 1164 (1996), that "recovery for conduct taking place outside the time period for filing a timely charge should be available only in hostile environment cases where the plaintiff reasonably did not know such conduct was discriminatory or where the discriminatory nature of such conduct is recognized as discriminatory only in light of later events." Morgan, ___ U.S. at ___ n. 11, 122 S.Ct. at 2074 n. 11, 153 L.Ed.2d at 124 n. 11.
It is precisely because the entire hostile work environment encompasses a single *1205 unlawful employment practice that we do not hold, as have some of the Circuits, that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct. [Title VII] does not separate individual acts that are part of the hostile environment claim from the whole for the purposes of timely filing and liability.

[___ U.S. at ___, 122 S.Ct. at 2075, 153 L.Ed.2d at 125.]
Before the Court decided Morgan, "continuing violations" were described in a leading treatise as "[u]nquestionably the biggest area of disagreementand arguably the most muddled area in all of employment discrimination law." 2 Lindemann at 1351. Until Morgan, "[t]he cases discussing `continuing violations' [were] impossible to reconcile." Ibid. The United States Supreme Court has now reconciled those cases.

C.
While not bound to do so, New Jersey courts have adopted federal Title VII standards of proof and procedure in cases brought under LAD or statutes incorporating LAD's procedures. E.g., Mogull v. CB Commercial Real Estate Group, 162 N.J. 449, 461-62, 744 A.2d 1186 (2000) (applying the elements and burdens of production and proof of Title VII claims to claims arising under LAD in a case of gender discrimination established by indirect proof); Craig v. Suburban Cablevision Inc., 140 N.J. 623, 631, 660 A.2d 505 (1995) (in a retaliatory discharge case, noting that New Jersey courts analyzing LAD claims have adopted Title VII framework and "methodology of proof"); Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 600, 626 A.2d 445 (1993) (a hostile work environment sexual harassment case noting that New Jersey courts frequently look to Title VII case law for guidance when resolving LAD claims); Erickson v. Marsh & McLennan Co., 117 N.J. 539, 550, 569 A.2d 793 (1990) (in sex discrimination case, noting that in LAD cases, New Jersey courts follow elements of Title VII claims and the same burdens of proof and production); DePalma v. Bldg. Inspection Underwriters, 350 N.J.Super. 195, 213, 794 A.2d 848 (App.Div.2002) (Family Leave Act case stating that "sufficiency of the proofs and the applicable burdens in LAD and CEPA cases generally follow case law under Title VII"); see also Kolb v. Burns, 320 N.J.Super. 467, 477, 727 A.2d 525 (App.Div.1999) ("analytical framework" of CEPA claims follows Title VII).

D.
The New Jersey Supreme Court has had occasion only once to address directly the continuing violation concept in a LAD case. Wilson v. Wal-Mart Stores, 158 N.J. 263, 729 A.2d 1006. But cf. Ali v. Rutgers, 166 N.J. 280, 288, 765 A.2d 714 (2000) (J. LaVecchia, dissenting). In Wilson, the plaintiff had endured her supervisor's "crude and indecent remarks" from May 1992 through March 4, 1994, when she was terminated. 158 N.J. at 267, 729 A.2d 1006. Some months before her termination, her original employer, K-Mart Stores, had sold the assets of the business to Wal-Mart. After her termination, Wilson filed a claim in the Division of Civil Rights alleging sexual harassment and age and sex discrimination in her termination (she was forty-nine years old when she was replaced by a male who was eleven *1206 years younger). When the Division failed to investigate her claim after almost two years, plaintiff filed a Superior Court action against K-Mart and Wal-Mart, two years to the day after her firing. Defendants filed motions for summary judgment based upon the exclusivity provision of N.J.S.A. 10:5-27; K-Mart also sought dismissal based upon the two-year statute of limitations and because it was not plaintiff's employer when she was fired. After the Law Division judge denied the motions, this court reversed and remanded for entry of judgment in favor of defendants based upon both the exclusivity provision and, as to K-Mart, the statute of limitations.
The Supreme Court reversed summary judgments as to both defendants. After rejecting the contention that plaintiff's suit was barred because she had not withdrawn her administrative complaint (as to which there had been no determination by the Division) before filing her lawsuit, the Court addressed "the more subtle and demanding question" of "when the statute of limitations begins to run on a hostile-work-environment sexual harassment claim in the context of successor-business enterprises, each of which has contributed to the creation of a hostile environment." Id. at 271-72, 729 A.2d 1006. Although the facts relevant to predecessor/successor liability were to be determined on remand to the trial court, the Supreme Court held that "[w]hen an individual is subject to a continual, cumulative pattern of tortious conduct, the statute of limitations does not begin to run until the wrongful action ceases." Id. at 272, 729 A.2d 1006. In so doing, the Court cited with approval the holdings of several state appellate courts, as well as our decision in Terry. The Court quoted at length from the opinion of the Louisiana Supreme Court in Bustamento v. Tucker, 607 So.2d 532, 540-41 (1992):
[I]t is the cumulation of acts and conduct, and the resulting cumulation of damages, that transforms the individual incidents of harassment into an actionable tort.... [H]ostile environment claims are often based on continuing violations because "[i]n a hostile environment, an individual feels constantly threatened even in the absence of constant harassment." ... A logical corollary is that once a pattern of harassment has created a psychologically offensive work environment, the status quo of such continuous wrongful conduct can be based on the harasser's mere presence.

[Wilson, 158 N.J. at 272-73, 729 A.2d 1006 (quoting Bustamento (internal citations omitted)).]
After noting that "a significant number of courts recognize that the cumulative effect of a series of discriminatory or harassing events represents a single cause of action for tolling purposes and that the statute of limitations period does not commence until the date of the final act of harassment," 158 N.J. at 273, 729 A.2d 1006, the Court in Wilson held that plaintiff's "complaint filed on March 4, 1996 may have been timely because it was filed within two years of the last act of continuous harassment." Id. at 274, 729 A.2d 1006. That conclusion is entirely consonant with the United States Supreme Court's recent holding in Morgan.
In rejecting Caggiano's contention that her hostile work environment claim was timely as a continuing violation, the motion judge misread Wilson. Nothing in the Supreme Court's opinion in Wilson is inconsistent with Morgan, and we adopt what is in effect Morgan's bright-line rule *1207 with respect to determining the timeliness of a hostile work environment claim as a continuing violation of the LAD. By adopting a rule that allows such a claim to proceed so long as at least one of a series of acts, which together created the hostile environment, fell within the statutory period, we avoid the necessity for the Berry test's additional level of fact-finding whether the plaintiff had reason to know that the earlier, arguably time-barred incidents were actionable and therefore should have filed sooner. In light of Morgan, and our Supreme Court's historic recognition of the similar elements of a Title VII and a LAD claim, we no longer view the Berry test as applicable to a continuing violation case and find no reason to impose the Berry test here.
Thus if a jury concludes that Sheriff Fontoura's comment at the February 15 training class was part of a pattern of continuous harassment, or that plaintiff was subjected to the hostile environment at least through the date in early December 1997 when she was told to write a report and was thereafter shunned by her co-workers, or December 15 when she was transferred to the Gibraltar Building, her claim of hostile environment would be timely with respect to the County defendants.

E.
Whether plaintiff's claims against the individual defendants, LeFrancis and Tutela, are barred is a more difficult question. If the factfinder believes plaintiff's allegations against Tutela, as the perpetrator of what can only be described as reprehensible and entirely unacceptable conduct, and against LeFrancis, as a supervisor who refused to protect plaintiff and the office from such conduct, it is disturbing to think that they can avoid liability while their public employer cannot. Subject to fact-finding that will require careful drafting of a jury verdict sheet, we find sufficient reason to reverse summary judgment as to those individuals as well. If Tutela remained in the transportation department after November 30, 1998, where Caggiano worked until December 15, his "mere presence" may be enough to support a continuing violation based upon prior conduct even though plaintiff does not claim any specific act by him after November 30. As to LeFrancis, if he retained any supervisory responsibility in the department after November 30, although he was out of state at the time, his failure to take action to stop the conduct, to discipline the perpetrators, and to protect plaintiff may bring his actions/inactions within the statute of limitations. Careful drafting of a jury verdict sheet should enable the trial court to sort out these questions.

VI.
As plaintiff accurately points out, defendants LeFrancis and Tutela produced no evidence in opposition to plaintiff's motion for summary judgment dismissing their counterclaim for defamation and malicious abuse of process. Those defendants allege that plaintiff's statements to other employees before she filed her Superior Court complaint (thus not entitled to absolute immunity) were false. Notably, neither filed an affidavit or certification denying the facts plaintiff reported in her statements. Thus they cannot establish the first required element of a defamation claim. Nor did they submit any evidence to support the third element of a defamation claiminjury to reputation or other damage. Assuming that plaintiff's *1208 statements, if false, would be defamatory, defendants nevertheless have failed to present a prima facie defamation case, and plaintiff was entitled to summary judgment. Of course, most of plaintiff's statements (and all those referred to in defendants' counterclaim itself) were made in the course of these judicial proceedings and are absolutely privileged.
It is true that the motion judge did not set forth any reason for granting summary judgment on the second count of defendants' counterclaim alleging malicious abuse of process. However, it is plain on the record before us that defendants have failed to set forth a prima facie case on that count as well. The cause of action requires proof of an improper motive or a perversion of the judicial process. See Tedards v. Auty, 232 N.J.Super. 541, 550, 557 A.2d 1030 (App.Div.1989) (citing Gambocz v. Apel, 102 N.J.Super. 123, 130-31, 245 A.2d 507 (App.Div.), certif. denied, 52 N.J. 485, 246 A.2d 447 (1968)). Defendants' reliance on plaintiff's statement that she discussed with another female officer the settlement of a sexual harassment case brought by female Sheriff's officers in Hudson County is insufficient as a matter of law to establish the required improper motive. We therefore affirm summary judgment dismissing LeFrancis's and Tutela's counterclaims.
In sum, the judgment dismissing LeFrancis's and Tutela's counterclaim is affirmed; the judgments dismissing counts one and three of plaintiff's complaint against both the County defendants and LeFrancis and Tutela are reversed; and the matter is remanded to the Law Division for further proceedings.
NOTES
[1] We shall address the procedural posture of this appeal in Section III below.
[2] Although the complaint and orders use the name "Ron," this defendant's papers use the first name "Ronald."
[3] Plaintiff is a lesbian.
[4] At oral argument, plaintiff's attorney stated that she was not alleging that it was improper to request plaintiff to write a report. We leave it to plaintiff and the court on remand to determine whether plaintiff's retaliation claim is to be revived.
[5] There has been no appeal from this order.
[6] As offensive as the quoted remarks are, we deem the language material, and therefore restate those remarks with only minimal alteration.
[7] This appeal does not address the substantive allegations of plaintiff's count three, but only its timeliness.
[8] Even a single incident can be sufficiently severe to establish an actionable hostile work environment claim. See, e.g., Taylor v. Metzger, 152 N.J. 490, 706 A.2d 685 (1998) (Sheriff's single utterance of a highly offensive racial epithet directed at African American female Sheriff's officer); Flizack v. Good News Home for Women, Inc., 346 N.J.Super. 150, 787 A.2d 228 (App.Div.2001) (female supervisor made racially charged comment and engaged in sexual misconduct directed at a female employee on one occasion). Of course, such a discrete incident by definition does not involve the statute of limitations issue before us.