NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3854-16T1

JEFFREY S. JACOBS,

        Plaintiff-Appellant/
        Cross-Respondent,

v.

MARK LINDSAY AND SON
PLUMBING & HEATING, INC.,
JOHN STRETAVSKI, individually,
and MARK D. LINDSAY,
individually,

        Defendants-Respondents/
        Cross-Appellants.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| February 20, 2019 |
| APPELLATE DIVISION |

Argued September 13, 2018 – Decided February 20, 2019

Before Judges Fuentes, Accurso and Moynihan.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Docket No. L-3120-14.

Anthony M. Rainone argued the cause for appellant/cross-respondent (Brach Eichler, LLC, attorneys; Anthony M. Rainone, of counsel and on the briefs; David J. Klein and Kent D. Anderson, on the briefs).

Steven K. Parness argued the cause for respondents/cross-appellants (Methfessel & Werbel,

attorneys; Steven K. Parness, of counsel and on the briefs; Boris Shapiro, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

Plaintiff Jeffrey S. Jacobs hired defendant Mark Lindsay and Son Plumbing & Heating, Inc. (MLSP) to repair his home air conditioning unit. Defendant made three service calls to repair the unit but was unable to correct the problem. After each service call, defendant provided plaintiff with an invoice that described the services performed and the parts installed. Plaintiff issued checks for the first two service calls. After defendant's third unsuccessful attempt to repair the unit, plaintiff refused to pay for this service call and placed a stop-payment order[1] on the two previously issued checks.

Instead of filing a civil action against plaintiff to recover the value of the services rendered, John Stretavski, an employee of MLSP, and defendant Mark Lindsay, owner of MLSP, filed an incident report with the Borough of Caldwell Police Department and accused plaintiff of theft of services.[2] After investigating defendant's allegation, the Caldwell Police Department formally charged plaintiff with the criminal offense of theft of services. Plaintiff

---

[1] See N.J.S.A. 12A:4-403(a).

[2] See N.J.S.A. 2C:20-8(a).

A-3854-16T1

retained an attorney to represent him in this criminal matter. The Caldwell Municipal Court dismissed the complaint against plaintiff for lack of probable cause.

Plaintiff thereafter filed a civil action against defendants alleging violations of the Consumer Fraud Act, N.J.S.A. 56:8-1 to -210 (CFA), malicious prosecution, defamation, and tortious interference with economic relationship.[3] After joinder of issue and exchange of discovery, the parties filed cross-motions for summary judgment. The Law Division Judge assigned to the case at the time granted plaintiff's motion for summary judgment on the CFA claims and denied defendants' cross-motion seeking the dismissal of plaintiff's complaint in its entirety. The judge found defendants violated the consumer protection provisions in N.J.S.A. 56:8-151 and N.J.A.C. 13:45A-10.2 when they failed to provide plaintiff with a written contract describing the services they agreed to provide and the methods used to determine the total charges for labor and parts. She found defendants engaged in an unconscionable commercial practice under N.J.S.A. 56:8-2, when they filed a criminal complaint against plaintiff as means of collecting a consumer debt. Finally, the judge found the attorneys' fees and related costs plaintiff incurred

---

[3] Plaintiff's complaint originally included a count alleging intentional infliction of emotional distress. He withdrew this count before the court decided his motion for summary judgment.

in the defense of the criminal charges constituted an "ascertainable loss" under N.J.S.A. 56:8-19 as an "out-of-pocket loss." See Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 248 (2005).

The judge held that the quantum of damages plaintiff was entitled to receive on the CFA claim and the viability of his common law claim of malicious prosecution were matters to be decided by a jury. The case was thereafter assigned to a different judge. On April 28, 2016, the parties appeared before this new judge and announced that they had reached a settlement agreement. As described by the judge, defendants agreed to pay plaintiff $45,000 "for any violation of the Consumer Fraud Act, except attorneys' fees . . . incurred by the plaintiff in prosecuting the consumer fraud action." In exchange, plaintiff agreed to dismiss the remaining common law claims of malicious prosecution, tortious interference, and defamation. On April 13, 2017, the judge awarded plaintiff $19,800 in attorneys' fees. On June 15, 2016, the parties executed an eighteen-page Settlement Agreement and General Release that comprehensively describes the terms of the settlement.

Against this procedural backdrop, plaintiff appeals the April 18, 2017 order awarding only $19,800 in counsel fees and costs. Defendants cross-appeal the December 18, 2015 order granting plaintiff's motion for summary judgment on his CFA claim. After reviewing de novo the record developed

before the Law Division, <u>Davis v. Brickman Landscaping, Ltd.</u>, 219 N.J. 395, 405 (2014), and applying the standards codified in <u>Rule</u> 4:46-2(c), we conclude defendants knowingly and voluntarily bargained away their right to challenge the Law Division's December 18, 2015 order and dismiss their cross-appeal accordingly. With respect to plaintiff's direct appeal, we reverse the April 18, 2017 order and remand for the court to apply the standards established by our Supreme Court to determine anew the amount of counsel fees plaintiff is entitled to receive as a prevailing party under N.J.S.A. 56:8-19. <u>Rendine v. Pantzer</u>, 141 N.J. 292, 316-45 (1995).

I

At all times relevant to this case, plaintiff worked as a financial advisor. On July 15, 2013, plaintiff went to the home of his client Ed Kohler. During this encounter, plaintiff told Kohler that his air conditioning unit had malfunctioned and he could not get anyone to come fix it. Kohler contacted his friend, defendant John Stretavski, general manager of defendant MLSP, a home improvement contractor that services residential air conditioning units. Stretavski agreed to go to plaintiff's home that night to attempt to repair the unit. Stretavski also contacted his boss, defendant Mark Lindsay, for permission to go on this service call. According to Stretavski, he told plaintiff that he would have to charge him for the service call. Thereafter, Stretavski

met plaintiff at Kohler's home and the three drove to plaintiff's home in separate vehicles.

Stretavski replaced the air conditioner unit's capacitor with a new one he had in his truck. Although he told plaintiff the unit most likely needed a new motor, he believed he may be able to get the old motor working with a new capacitor. According to Stretavski's deposition testimony, plaintiff approved this attempted repair. The "blower motor" started running after Stretavski replaced the capacitor. Stretavski testified that he explained to plaintiff that "based upon the noise [he] heard [he] was not sure if the blower motor would last five minutes or five months."

At this point, the three men (plaintiff, Stretavski, and Kohler) went outside to check "the charge of the unit." Stretavski also checked the amount of refrigerant available and found the pressure was low. Stretavski testified he told plaintiff the unit needed more refrigerant. Once again, Stretavski testified plaintiff approved adding more refrigerant after Stretavski told him the price. As soon as Stretavski added the refrigerant, he heard a loud noise from the basement. In Stretavski's words: "[s]o that was indicative that I lost air flow and the motor went."

Stretavski told plaintiff that the unit required a new motor. Because he did not have a replacement motor in his truck, he would have to return the next

6

day to install it. According to Stretavski, he told plaintiff the price of a motor was between $500 and $800. He also provided him with a handwritten invoice for the work he had done that night, which amounted to $596.06. Plaintiff wrote a check for this amount but did not sign the invoice. When asked about plaintiff's failure to sign the invoice, Stretavski explained: "I felt comfortable with him as far as being an acquaintance of Ed Kohler."

Stretavski returned to plaintiff's home the next day and installed the new blower motor. However, when Stretavski started the system, he noticed "once again that large line that we typically see condensation forming after a little bit of time was not present yet again." Stretavski went outside and determined "that the system had absolutely no Freon. There was zero. No Freon." Stretavski acknowledged: (1) he had added Freon the previous day; (2) there was a leak; and (3) he did not check if there was a leak before installing a new blower motor because he needed air flow. Stretavski testified that plaintiff "started to get a little bit annoyed" when he told him that he would need to perform a nitrogen test to determine where the leak in the system was located. Stretavski provided plaintiff with an invoice for the new motor, which plaintiff paid with a check. On the invoice for the new motor, Stretavski also wrote the price of the nitrogen test was an additional $289.22. Plaintiff and Stretavski

7

then arranged to have two technicians from MLSP come to perform the nitrogen test.

The two technicians arrived to perform the nitrogen test later that same day. Plaintiff authorized the technicians to perform the test. They discovered a leak in the coil. Technician Kenneth Bryan told plaintiff the coil needed to be replaced. He also advised plaintiff to replace the entire unit and estimated the coil replacement alone would cost "a couple thousand." Plaintiff told Bryan that he did not want to replace the coil. When Bryan gave him the $289 invoice for the nitrogen test, plaintiff refused to pay it. Bryan called Stretavski to apprise him of plaintiff's refusal to pay. Stretavski instructed Bryan to write: "to be billed" on the invoice, and told him they would deal with it at a later time. According to plaintiff, after this interaction, no one from MLSP contacted him to resolve the billing dispute. In his deposition, Stretavski testified he called plaintiff on July 16, 2013 and left a voicemail. Stretavski claimed plaintiff did not return his call. It is undisputed that plaintiff did not pay for the third service call and thereafter placed a stop payment order on the two checks he previously issued to defendants.

On August 21, 2013, Stretavski gave a "Voluntary/Witness Statement" to the Caldwell Police Department that described his interactions with plaintiff concerning the three service calls that failed to repair the air conditioning unit.

Stretavski also gave the police officers copies of all three invoices, and copies of the two checks which were the subject of the stop payment orders. Caldwell Police Detective Sergeant Brad Palatucci's investigation of this matter consisted entirely of speaking with plaintiff, Stretavski, and Kohler. Based exclusively on what he learned from these conversations, Palatucci issued a Summons Complaint against plaintiff on October 15, 2013, charging him with the criminal offense of third degree theft of services pursuant to N.J.S.A. 2C:20-8(a). Palatucci provided the following evidential basis to support this charge:

> [Jacobs] did: within the jurisdiction of this court, commit the offense of theft by purposely obtaining services, to wit plumbing and air conditioning repair services (Mark Lindsay Plumbing), without payment or offer to pay by cancelling checks for payment before payment could be cleared and refusing to pay for services, knowing the services are only available for compensation, specifically by, writing check number 1064 in the amount of $596.06 to satisfy invoice 13901 and check number 1065 in the amount of [$]575.55 to satisfy invoice number 13903 and cancelling said checks before payment could be completed and refusing to pay invoice number 16519 after all services had been rendered.

At his deposition, Palatucci admitted he told plaintiff he would not file criminal charges against him if he agreed to pay MLSP the three disputed invoices. When plaintiff refused, Palatucci told him he had twenty-four hours to turn himself in or a warrant would issue for his arrest. On October 17,

2013, plaintiff retained counsel and surrendered himself to the Caldwell Police Department where he was photographed, fingerprinted, and otherwise processed as a defendant facing criminal charges. On November 18, 2013, plaintiff appeared before the Caldwell Municipal Court for arraignment. With the consent of the municipal prosecutor, the municipal court judge dismissed the complaint for lack of probable cause. It is undisputed, however, that plaintiff's professional status as a financial professional required him to amend his "Uniform Application for Securities Industry Registration or Transfer" to reflect this criminal charge.

Defendant Lindsay also admitted that MLSP has instituted criminal actions in the past as a means of collecting unpaid invoices. The following deposition testimony from Lindsay illustrates this point:

> Q. You mentioned before about a lawsuit that was filed to collect money that was due, was that brought by you individually or by your company?
>
> A. By the company.
>
> Q. Now, in that lawsuit was a criminal complaint filed on behalf of the company?
>
> A. No.
>
> . . . .
>
> Q. Why did you decide to sue as opposed to file a criminal complaint?

A. The amount of the money.

Q. How much was the amount of the lawsuit?

A. I don't know the exact amount, about $25,000.

Q. And you mentioned that the criminal complaint that was - - that you filed the second time - - well, the first complaint, the first criminal complaint approximately 14 years ago, do you recall how much that was for?

A. No, I do not.

Q. Do you recall the second one?

A. Yes.

Q. How much?

A. I said that before.  I think $2,500.

Q. So did you decide to - - is it fair to say that because more was owed in connection with the lawsuit you decided to go the civil route as opposed to the criminal route?

. . . .

A. Yes.

Q.  . . . do you know how much Mr. Jacobs owes your company?  According to defendants do you know how much - -

A. What I [said], [$]1,400.

Q. And the fact that it's [$]1,400, would that - - is that why a criminal complaint was filed as opposed to a lawsuit?

11

. . . .

A. Yes.

II

We begin our analysis by addressing the arguments defendants' raised in their cross-appeal. Defendants' counsel prepared the consent order entered by the court on April 18, 2017. Defendants, "by and through their insurance carrier," agreed to pay plaintiff $45,000 to dismiss counts II, III, and IV in the complaint, "without admitting any fault or wrongdoing." With respect to the CFA claims, the parties acknowledged that the court had "determined that [p]laintiff proved a violation of the Consumer Fraud Act's (CFA) technical requirements and an unconscionable commercial practice, which resulted in an ascertainable loss pursuant to the CFA, rendering [p]laintiff a prevailing party and that determination is not altered or amended by this Consent Order." (Emphasis added).

Despite these assertions, "[d]efendants reserve[d] the right to appeal the [c]ourt's prior grant of [s]ummary [j]udgment [under] the [CFA]." The Consent Order also paradoxically provided that:

> should a higher court overturn the [c]ourt's ruling as to the Consumer Fraud Act, such a ruling will not (i) impact the settlement amount paid to [p]laintiff, and that no refund of any amount of the settlement shall be required by [p]laintiff; and (ii) [p]laintiff shall have the right to prosecute his CFA [claims] against

[d]efendants pursuant to an[d] in accordance with the higher court's ruling, but in the event that [p]laintiff does so, his remedy is limited to seeking an award of attorneys' fees and costs.

It is a long-established principle of appellate jurisprudence in our State that an order consented to by the attorneys for each party is ordinarily not appealable. Winberry v. Salisbury, 5 N.J. 240, 255 (1950); see also N.J. Sch. Constr. Corp. v. Lopez, 412 N.J. Super. 298, 309 (App. Div. 2010); Janicky v. Point Bay Fuel, Inc., 410 N.J. Super. 203, 207 (App. Div. 2009). "This is because the rule allowing an appeal as of right from a final judgment contemplates a judgment entered involuntarily against the losing party." N.J. Sch. Constr. Corp., 412 N.J. Super. at 309 (citing Cooper Med. Ctr. v. Boyd, 179 N.J. Super. 53, 56 (App. Div. 1981)). Even when the consent order includes a clause preserving an issue for appeal, "the practice is disapproved of because it preempts the appellate court's authority to decide whether to hear an interlocutory appeal," improperly placing jurisdiction upon the appellate court. Ibid. (citing Caggiano v. Fontoura, 354 N.J. Super. 111, 124 (App. Div. 2002)). Succinctly stated, including a clause in a consent order that preserves the right to appeal does not automatically make the order appealable. Ibid. (citing Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996)).

Here, the language we have quoted from the Consent Order reveals that our review of the Law Division's ruling concerning defendants' liability under

13

the CFA would constitute nothing more than an academic exercise. Plaintiff retains the $45,000 settlement paid by defendants' insurance carrier regardless of how this court views the Law Division's ruling. Stated differently, defendants' attempt to preserve their right to appeal the Law Division's order that found them liable under the CFA is nothing more than a transparent subterfuge intended to obtain an advisory ruling from this court on a question of law. We thus dismiss defendants' cross-appeal in accordance with the Supreme Court's holding in Winberry, 5 N.J. at 255.

III

We now address plaintiff's appeal challenging the Law Division's April 18, 2017 order awarding $19,800 in counsel fees under N.J.S.A. 56:8-19, but failing to award any compensation for filing fees and costs of suit. We begin our analysis by reaffirming that an appellate court will disturb a fee determination made by the trial court "on the rarest of occasions, and then only because of a clear abuse of discretion." Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001) (quoting Rendine, 141 N.J. at 317). Guided by this standard and the clear language in N.J.S.A. 56:8-19, we are satisfied the judge's determination cannot stand.

Plaintiff submitted his revised and final fee application on January 24, 2017. The application included an itemized summary of the $247,701 in

14

attorneys' fees sought without enhancement.  The hourly rates of compensation for the attorneys involved in this case were based on their status within the firm.  Partners sought an hourly rate of $490 and $385 for associates. Paralegals were billed at $250 per hour.  The application separated the billing into eleven "litigation phases," and included charts that described how much was billed in each phase of the litigation.  Plaintiff's counsel also sought a thirty-three percent enhancement, which amounted to $81,882.70.  The total attorneys' fee award sought was thus $327,776.70.  Plaintiff sought an additional $24,377.39 in costs and disbursements; this included $22,690.09 set forth in plaintiff's initial certification of professional services dated May 31, 2016, and an additional $1,687.30 expended since that date.

The record shows that in reviewing plaintiff's counsel's fee application, the judge did not appreciate the interrelation between facts supporting defendants' unconscionable commercial practices claim under the CFA and the common law torts of malicious prosecution, defamation, and tortious interference with economic relationships.  The judge thus disallowed as unrelated to the CFA, professional time devoted by plaintiff's counsel in discovery that touched upon or overlapped with these common law claims.

The judge also did not have a correct understanding or appreciation of the underlying material facts that led the first judge assigned to this case to

grant plaintiff's motion for summary judgment on the CFA claims. We conclude this threshold error significantly tainted the judge's perception of the case and contributed to her misapplication of the standards for awarding counsel fees in this case. The following prefatory comments the judge made before delivering her oral ruling on plaintiff's fee application illustrate the magnitude of her misconception of the material facts of this case:

> This is a case that's unusual for this Judge because this Judge was not the Judge that determined there had been a violation of the Consumer Fraud Act. This case has its genesis in a contractor that went to the plaintiff's home after requests of a mutual friend and business associate because it was mid-summer, it was very hot, [and] the plaintiff's air conditioner wasn't working. There was some back and forth, some attempts at repair. They weren't successful, a final attempt at repair that wasn't successful. The plaintiff had issued checks. Then the plaintiff stopped payment on the checks.

> The defendant then went to the police department to seek collection on the checks. A police officer filed a criminal complaint. It appears everybody agrees that no - - no defendant was notified of the proceedings in the court. The municipal court Judge dismissed the criminal complaint that had been filed against the plaintiff by the police officer and the plaintiff spent $1,750 in attorneys' fees, appearing in the municipal court on that day.

> There was another Judge who heard summary judgment motions in this case and that other Judge ruled that the Consumer Fraud Act had been violated by the repairer entity because of the nature of their invoices and paperwork. Something had been

16

missing. I forget exactly what is was[.] . . . [W]hatever information is required to be there, whatever disclosures are required to be made was not contained in the paperwork.

And so the Judge reasoned, since that paperwork was the foundation for going to the police, therefore, going to the police was an unconscionable commercial practice and the amount of attorneys' fees incurred in defending one's self in the municipal court represented the loss associated with that.

These "facts" bear no relation to the salient facts we have described at length here and expressly relied on by the first judge to support her decision to grant plaintiff's motion for summary judgment on his CFA claims. Specifically, nowhere in the judge's rendition is a reference to Lindsay's deposition testimony in which he admits to engaging in the unconscionable commercial practice of using the local police department as his company's debt collection agency. Based on her misconception of the basis for the prior summary judgment, the judge made the following findings in support of her decision to award plaintiff a total of $19,800 in counsel fees (which amounts to six percent of the $327,776.70 requested by plaintiff's counsel), and zero compensation for costs:

I believe the plaintiff is entitled to an award of attorneys' fees for the preparation and the filing of the summary judgment motion. . . . I don't believe that [the] motion should have taken an entire month of a senior person's time to prepare. That is unreasonable, particularly, when we look at what the summary

judgment motion would have had to have been on the Consumer Fraud Act alone.

And so on that, the [c]ourt will allow as and for the preparation of the summary judgment motion, the [c]ourt will allow the plaintiff 40 hours at a blended rate of $300 an hour. The [c]ourt has used a blended rate because it believes that . . . it's unreasonable to have the entire motion done by some of the most senior people in the firm. And so the [c]ourt has simply blended a rate of . . . what the defendant argues and what the plaintiff argues. We'll make it a blended rate of [$]300 an hour. And so as and for the preparation of the summary judgment motion, plaintiff will be awarded $12,000.

There had to be some discovery here. . . . There had to be review of document request [sic], there had to be some scheduling, et cetera. The [c]ourt will allow 20 hours of preparing and reviewing discovery but, again, it's going to be at the blended rate of [$]300 because much of that could have been delegated to a junior person with a senior person reviewing it. And so that's $6,000 for the discovery.

So for the discovery and the summary judgment motion and we'll allow for some time for drafting of the complaint and that practicality, the [c]ourt will allow six hours for that, again, at the blended rate, so that's $1,800. So the [c]ourt will allow $19,800.

I'll say the following. In the event of any appeal, this [c]ourt recognizes that the difficult challenge presented was the [c]ourt was caught between a rock and [a] hard [place]. It was not for the [c]ourt to go through all hundreds of entries of the plaintiff and try and see, can I discern what is or isn't the Consumer Fraud Act issue here. My attempts at doing that into the wee hours of the morning advised me that that wasn't . . . the way to do it. It couldn't be because I

> found very little distinction. So it wasn't for the [c]ourt to do that exercise.
>
> The [c]ourt has examined the bills. The [c]ourt has determined that certain -- that what would a reasonable attorney have to do to get this result and to the extent that's not the standard, then the [c]ourt would have had to have determined that. I couldn't award the plaintiff any fees. And, as I said, I don't think that's fair and plaintiff was a successful Consumer Fraud Act claimant, and so the [c]ourt will award that amount of fees.

Under the CFA, "the court shall . . . award reasonable attorneys' fees, filing fees and reasonable costs of suit" to a prevailing plaintiff "who suffers any ascertainable loss of moneys or property" because of a violation of the statute. N.J.S.A. 56:8-19. The court's first step in awarding a reasonable amount of attorneys' fees is determining the lodestar, "which equals 'the number of hours reasonably expended multiplied by a reasonable hourly rate.'" Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 21 (2004) (quoting Rendine, 141 N.J. at 335). Rule 4:42-9(b) requires an application for counsel fees to be supported by an affidavit addressing the following pertinent factors articulated in RPC 1.5(a):

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal

services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; (8) whether the fee is fixed or contingent.

A trial court must use a four-prong test to determine the lodestar amount. Furst, 182 N.J. at 22-23. First, the trial court "must determine the reasonableness of the rates proposed by prevailing counsel in support of the fee application." Id. at 22 (citing Rendine, 141 N.J. at 335). Here, the court evaluates the "rate of the prevailing attorney in comparison to rates 'for similar services by lawyers of reasonably comparable skill, experience, and reputation' in the community." Ibid. (citing Rendine, 141 N.J. at 337). The second determination is "whether the time expended in pursuit of the 'interests to be vindicated,' the 'underlying statutory objectives,' and recoverable damages is equivalent to the time 'competent counsel reasonably would have expended to achieve a comparable result. . . .'" Ibid. (citing Rendine, 141 N.J. at 336). The court may determine that the hours expended on a case are excessive if it was not "reasonable under the circumstances." Id. at 22-23.

Third, although proportionality is not required between the damages recovered and the award, the court "should decrease the lodestar if the prevailing party achieved limited success in relation to the relief he had

sought." Id. at 23 (citing Rendine, 141 N.J. at 336). Fourth, an attorney may be entitled to a fee enhancement if there is a contingent-fee arrangement. Ibid. (citing Rendine, 141 N.J. at 338). If a fee enhancement is appropriate, "the court should consider the result achieved, the risks involved, and the relative likelihood of success in the undertaking" to determine the amount of enhancement. Ibid. (citing Rendine, 141 N.J. at 340-41).

As an intermediate appellate court, we disturb fee determinations made by the trial judge only if there is evidence of a clear abuse of discretion. This "may be demonstrated 'if the discretionary act was not premised upon consideration of all relevant factors, was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error in judgment.'" Heyert v. Taddese, 431 N.J. Super. 388, 444 (App. Div. 2013) (quoting Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005)). Here, the methodology used by the judge is untethered to the standards adopted by our Supreme Court for determining an award of counsel fees. The ultimate conclusions reached by the judge were thus arbitrary. The judge's comments at the end also revealed a misunderstanding and a lack of appreciation of the difficult task performed by attorneys in these types of cases and undermines the salutary social policy of the CFA's fee-shifting provision.

Plaintiff also sought an award of $24,377.39 in litigation costs and filing fees. Although N.J.S.A. 56:8-19 expressly requires the court to award plaintiff "filing fees and reasonable costs of suit," the judge did not award plaintiff any compensation to cover these costs or provide any explanation for this omission in her April 13, 2017 oral decision or the April 18, 2017 final order.

More than twenty years ago, our Supreme Court declared that "in allowing for private suits in addition to actions instituted by the Attorney General, [the CFA] contemplates that consumers will act as 'private attorneys general.'" Lemelledo v. Benefit Mgmt. Corp., 150 N.J. 255, 268 (1997). Thus, as a matter of public policy, the Legislature enacted fee-shifting provisions in remedial statutes like the CFA to induce competent counsel and advance the public interest through private enforcement of statutory rights that the government alone cannot enforce. Pinto v. Spectrum Chems. & Lab. Prods., 200 N.J. 580, 593 (2010). The Court has noted that:

> In a consumer fraud action, the Legislature has recognized that the right of access to the courts is meaningless unless the injured party has the resources to launch a suit. Fee-shifting provides an incentive to competent counsel to undertake high-risk cases and to represent victims of fraud who suffer relatively minor losses.
>
> [Furst, 182 N.J. at 21.]

Here, Lindsay admitted that MLSP has a history of instituting criminal actions as a means of collecting its unpaid invoices. This outrageous abuse of our criminal justice system is precisely the type of unconscionable commercial practice the CFA was designed to protect consumers from and deter unscrupulous commercial entities from engaging in. However, the salutary purpose of the CFA is undercut if the professional work performed by competent private counsel in the course of representing consumers victimized by such practices is arbitrarily undervalued by the judges entrusted to enforce the CFA's fee-shifting provision.

Pursuant to N.J.S.A. 56:8-19, plaintiff is entitled to an award of counsel fees that reflects the work performed to bring about a successful outcome for the consumer, independent of the "proportionality between damages recovered and counsel-fee awards even if the litigation, as in this case, vindicates no rights other than those of the plaintiff." Szczepanski v. Newcomb Med. Ctr., 141 N.J. 346, 366 (1995). Furthermore, plaintiff's counsel was entitled to have the judge carefully consider and determine its application for a contingency enhancement adopted in Rendine, 141 N.J. at 337 and subsequently reaffirmed in Walker v. Giuffre, 209 N.J. 124, 128-29 (2012). Finally, in all CFA actions, a prevailing consumer is entitled "to filing fees and reasonable costs of suit." N.J.S.A. 56:8-19.

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3854-16T1