**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1502-15T1
                A-3507-15T2

ELIZABETH B. POLING, individually
and as co-trustee of the ISAIAH D.
BARCLAY DEED OF TRUST
DATED 5/27/63, and as co-trustee
of the GLADYS S. BARCLAY DEED OF
TRUST DATED 5/27/63; and EDWARD L.
POLING, individually and as co-
trustee of the ISAIAH D. BARCLAY
DEED OF TRUST DATED 5/27/63, and
as co-trustee of the GLADYS S.
BARCLAY DEED OF TRUST DATED
5/27/63,

      Plaintiffs-Appellants,

v.

BNY MELLON WEALTH MANAGEMENT;
MATTHEW J. WALKER, in his
capacity as trust officer for
BNY MELLON WEALTH MANAGEMENT;
and MARK A. SOLOMON, PARTITION
COMMISSIONER,

      Defendants-Respondents.

_____

ALBERT C. BARCLAY, JR., General
Partner of Barcland Limited
Partnership, WILLIAM S. BARCLAY,
ELIZABETH M. BARCLAY, and
MELLON BANK, NA, co-trustees
of the TRUST FOR WILLIAM S.
BARCLAY UNDER THE I.D. BARCLAY
TRUST AGREEMENT DATED 5/27/63,
WILLIAM S. BARCLAY, ELLEN B.
DEBLOIS, and I. DAVID BARCLAY,

     Plaintiffs,

v.

ALBERT C. BARCLAY, JR.,
trustee under the will of
GLADYS S. BARCLAY OF TRUSTS
FOR ELIZABETH B. POLING AND
J. CLARK POLING, EDWARD L. POLING,
ELIZABETH B. POLING, E. BARCLAY
POLING, DANIEL L. POLING, JOHN C.
POLING, SUSAN B. WALCOTT and J.
KERNEY KUSER II, co-trustees of
the TRUST FOR SUSAN WALCOTT UNDER
THE WILL OF E. STANLEY BARCLAY,
EDWARD S. BARCLAY, JR. and
ALBERT C. BARCLAY, JR., co-
trustees of the TRUST FOR
EDWARD S. BARCLAY, JR., under
the WILL OF E. STANLEY BARCLAY,
and K. HOVNANIAN COMPANIES OF
CENTRAL NEW JERSEY, INC.,

     Defendants,

and

A-1502-15T1

J. CLARK POLING,

       Defendant-Appellant,

and

MELLON BANK, NA, co-trustees
of the TRUST FOR ELIZABETH B.
POLING UNDER THE I.D. BARCLAY
TRUST AGREEMENT DATED 5/27/63,

       Defendant-Respondent.

_____

K. HOVANIAN COMPANIES OF
CENTRAL NEW JERSEY, INC.,

       Plaintiff,

v.

BARCLAND LIMITED PARTNERSHIP,
SUSAN WALCOTT TRUST, EDWARD
BARCLAY TRUST, WILLIAM S.
BARCLAY TRUST UNDER I.D.
BARCLAY TRUST AGREEMENT,
WILLIAM S. BARCLAY, individually,
ELIZABETH B. POLING TRUST
UNDER I.D. BARCLAY TRUST
AGREEMENT, and ALBERT C.
BARCLAY JR., trustee under
the WILL OF GLADYS BARCLAY,

       Defendants.

_____

3

STATE OF NEW JERSEY, BY THE
COMMISSIONER of TRANSPORTATION,

     Plaintiff,

v.

BARCLAND LIMITED PARTNERSHIP,

     Defendants.

_____

Submitted April 23, 2018 – Decided October 29, 2018

Before Judges Sabatino, Ostrer and Rose.

On appeal from Superior Court of New Jersey, Chancery Division, Mercer County, Docket No. C-000041-15 (A-1502-15) and Docket Nos. C-000209-95 and C-000146-96, and Law Division, Docket No. L-1562-96 (A-3507-15).

Elizabeth B. Poling, appellant pro se in A-1502-15.

James Clark Poling, appellant pro se in A-3507-15.

Dechert, LLP, attorneys for respondents BNY Mellon, N.A. and Matthew J. Walker in A-1502-15 and respondent BNY Mellon, N.A. in A-3507-15 (J. Ian Downes and Roxanne R. Wright, on the briefs).

Pepper Hamilton LLP, attorneys for respondent Mark A. Solomon in A-1502-15, and respondent Jonathan M. Preziosi in A-3507-15 (Jonathan M. Preziosi and Christopher P. Soper, on the briefs).

The opinion of the court was delivered by

OSTRER, J.A.D.

These back-to-back appeals, consolidated for purposes of our opinion, arise out of a long-running dispute involving the partition by sale of roughly 120 acres of what was once farmland in East Windsor Township, known both as the Chamberlin Farm and the Van Hise Farm (we will use the former appellation).[1] In A-3507-15, James Clark Poling appeals from three Chancery Division orders entered on December 24, 2015: (1) approving the sale of the last unsold portion of the property, consisting of roughly seven acres; (2) appointing Jonathan M. Preziosi to be partition commissioner, succeeding Mark A. Solomon; and (3) denying James's[2] cross-motion to dismiss. In A-1502-15, Elizabeth B. Poling

---

[1] The land was divided into east and west parcels by One Mile Road. The farm was once considerably larger, but almost forty acres of the east parcel was conveyed to the State Department of Transportation (DOT) under threat of condemnation in 1991 for construction of Route 133, the Hightstown Bypass. That left 133 acres. That was further reduced by DOT taking thirteen acres of the west parcel, pursuant to an order in State of New Jersey, by the Commissioner of Transportation v. Barcland Limited Partnership, MER-L-1562-96. The State agreed with the owners to pay $1,200,000. That taking split the west parcel into two sub-parcels, consisting of seventeen acres to the north, and what was believed for a while to be nine acres to the south of taken property, but was later found after a survey to be just over seven acres. That left roughly ninety-five acres to the east, and twenty-four acres to the west. Although the condemnation action was consolidated with the partition action, it is not a subject of this appeal.

[2] For convenience, and without meaning any disrespect, we will sometimes refer to members of the Barclay and Poling families by their first names.

appeals from two Chancery Division orders entered on November 6, 2015: (1) dismissing with prejudice her claim against Solomon, enjoining any future litigation against him as partition commissioner, and requiring reimbursement of Solomon's costs and fees; and (2) dismissing with prejudice her 2015 complaint against defendant BNY Mellon, NA (Mellon), as corporate trustee for the Isaiah D. Barclay Trust and the Gladys S. Barclay Trust, and Matthew J. Walker, in his capacity as a trust officer. Having reviewed James's and Elizabeth's arguments in light of the record and applicable principles of law, we affirm in part and reverse in part.

I.

In 1953, title to Chamberlin Farm passed in equal one-third shares to three brothers, Albert C., E. Stanley, and Isaiah D. Barclay. Intra-family litigation began in 1995. By then, interests were distributed among multiple family members and trusts.

In particular, Isaiah, who died in 1968, left seventy percent of his interest to trusts for his two children, with the balance to his wife. Consequently, he left 11.8 percent of Chamberlin Farm to the I.D. Barclay Trust for Elizabeth Poling,

who was his daughter (Isaiah-to-Elizabeth Trust).[3]  An equivalent share was left to a trust for Elizabeth's brother, William S. Barclay (Isaiah-to-William Trust). Elizabeth and her husband Edward, who has since died, were co-trustees of the Isaiah-to-Elizabeth Trust.

Isaiah's wife Gladys died in 1977 and left her interest to her children and grandchildren, including a 3.42 percent interest in Chamberlin Farm to the G.S. Barclay Trust for Elizabeth Poling (Gladys-to-Elizabeth Trust), and an equivalent amount to a trust for William S. Barclay (Gladys-to-William Trust).[4] Gladys's will also created trusts for the benefit of her six grandchildren (Grandchildren Trusts), including one for James, resulting in a 0.488 percent interest in each Grandchildren Trust.

Albert C. Barclay transferred his one-third interest to Barcland Limited Partnership, of which Albert C. Barclay, Jr. was the general partner.  Through E. Stanley's will, his one-third interest passed to trusts for his children, the Edward S. Barclay, Jr. Trust and the Susan B. Walcott Trust.

---

[3]  We utilize percentage figures set forth in the court's 1999 order, recognizing that James contests them.

[4]  Gladys's will directed that thirty-five percent of her estate go to Elizabeth; the same share to William; and thirty percent to the children.

A-1502-15T1

In 1988, K. Hovnanian Companies obtained the option to purchase the ninety-five-acre parcel, which it exercised in 1995. An environmental issue arose that prevented the transaction from closing. By 1995, Albert[5] brought suit to force a resolution of the environmental issue and completion of the sale. As later amended, the complaint sought appointment of a partition commissioner empowered to sell both the ninety-five-acre parcel, and the remaining parcel to the west. Albert brought suit on behalf of: himself, as general partner of Barcland Limited Partnership; William S. Barclay and Elizabeth M. Barclay and Mellon Bank, N.A. as co-trustees of the trust for William S. Barclay; and William S. Barclay, Ellen B. DeBlois and I. David Barclay, individually – the latter two being William S. Barclay's children, and grandchildren of Gladys Barclay.

Named as defendants were the other owners of the Chamberlin Farm, including the trustees of the trusts created by E. Stanley Barclay; the trusts benefiting Elizabeth and James; and E. Barclay Poling, Daniel L. Poling and John C. Poling, individually. In some respects, Albert was both plaintiff and defendant, as he was a trustee of the Gladys-to-Elizabeth Trust and the Grandchildren Trust for James. To avoid a conflict of interest, in March 1996,

---

[5] We use "Albert" to refer to Albert C. Barclay, Jr.

the court appointed Daniel L. Poling, as "Trustee Ad Litem" for the Gladys-to-Elizabeth Trust and James's Grandchildren Trust. Plaintiffs later added K. Hovnanian as a party-defendant, which then filed its own lawsuit against Barcland Ltd. and others for breach of contract.[6]

The Poling family[7] wanted to keep land in agriculture. Through Daniel, the Poling family proposed partitioning out their interests in Chamberlin Farm so they could purchase the remainder interest in another farm property owned by the descendants of the three brothers. No agreement was reached.

Daniel also contended that none of Isaiah's interest passed to the Isaiah-to-Elizabeth Trust or Isaiah-to-William Trust. Instead, Isaiah's entire one-third share passed to Gladys, and then to the trusts created under her will. Consequently, Elizabeth would have an 11.7 percent beneficial share in Chamberlin Farm, Gladys's grandchildren would each have 1.67 percent share. Gladys had four Poling grandchildren. In total, the Poling family would have

---

[6] K. Hovnanian Co. v. Barcland Ltd., MER-C-0146-96. That lawsuit was consolidated with the partition action, but then bifurcated from it. After settlement of that litigation, a Toll Brothers entity became the purchaser and developer of the ninety-five-acre parcel. The settled Hovnanian lawsuit is not a subject of this appeal.

[7] We use "the Poling family" to refer to Elizabeth and her children.

an 18.3, instead of 17.2,[8] percent share in Chamberlin Farm. In 1996, Daniel executed deeds (the Daniel deeds) as "Trustee ad litem under the will of Gladys S. Barclay" to effectuate these alleged shares in Chamberlin Farm. As discussed below, the validity of these so-called "out-of-trust" transfers figures prominently in the issues on appeal.

In August 1997, the court ordered that Chamberlin Farm be partitioned by sale. According to the court, all property owners stipulated to partition by sale. In January 1998, the court denied Albert's motion to resolve the differing views regarding the allocation of ownership shares in Chamberlin Farm.

That same year, the court appointed Thomas C. Jamieson partition commissioner to effectuate the sale of Chamberlin Farm. The court's October 1998 order noted the opposition of James and other Poling family members. Jamieson thereafter negotiated the sale of the ninety-five-acre parcel to Toll Brothers, Inc. for $5.5 million. The court confirmed the sale by order entered January 19, 1999, but the transaction did not close immediately.

---

[8] We gather the 17.2 percent was the sum of 11.8 percent from the Isaiah-to-Elizabeth Trust; plus 3.42 percent from the Gladys-to-Elizabeth Trust; plus 0.488 percent each from E. Barclay, Daniel, and John C. Poling, and the Trust for James Poling.

The Poling family thereafter stipulated "without prejudice" that their collective interest was 17.2 percent, which the court memorialized in a July 29, 1999 order. The court's order stated that the stipulation was "for litigation purposes in this Court." The court approved "the severance of pending 'percentage claims' for litigation/arbitration purposes." The 17.2 percent allocation was consistent with the shares that Albert advocated.

However, the Poling family members thereafter continued to seek a partition in kind. The court rejected that request in October 1999, noting that the parties had previously agreed to a partition by sale. The court also definitively determined the parties' respective shares, consistent with those asserted by Albert and the Poling family members' stipulation without prejudice. The court's reasons were set forth in an oral decision on August 31, 1999, and the court's written opinion of the same date.[9]

While the litigation proceeded in New Jersey courts, members of the Poling family initiated unsuccessful litigation in federal court. In 1998, James

---

[9] The record does not include the transcript of the court's oral decision. The court's written opinion refers only to the Poling family's "without prejudice" stipulation as grounds for the allocation of shares. In the same opinion, the court severed Hovnanian's suit against Barcland and ordered that the matter be referred to arbitration, consistent with an arbitration clause in the parties' contract.

and John Poling filed a federal action against thirty-six defendants including Albert and other Barclay descendants, as well as Jamieson, Mellon, and others, claiming they were "victims of a 30-year embezzlement scheme to deprive them of a larger inheritance under their grandparents' wills." Poling v. K. Hovnanian Enters., 99 F. Supp. 2d 502, 506 (D.N.J. 2000). The court found that the plaintiffs failed to plead fraud with particularity; and failed to establish diversity jurisdiction over state law claims. Id. at 506, 517. The court found the claim against the partition commissioner particularly egregious, and "border[ed] on the sanctionable," because he "clearly ha[d] absolute qualified judicial immunity in this case." Id. at 517 n. 17.

In another federal lawsuit, Cranbury Brook Farms v. Twp. of Cranbury, Civ. No. 00-05066 (D.N.J. July 10, 2001), James and John Poling, along with Cranbury Brook Farms, "sought damages for interference with property interests and plans through deprivation of rights, privileges, and immunities secured by the Constitution and laws of the United States." Letter Opinion at 3. James and John again sued partition commissioner Jamieson. Ibid. Although the plaintiffs voluntarily dismissed the suit, the court (by a different judge) imposed Rule 11 sanctions for including the partition commissioner, noting the court's prior decision, and concluding that "even a cursory examination of the law . . . would

A-1502-15T1

have reflected that the Complaint against Jamieson has no legal basis." Id. at 60.

On November 16, 2000, the owners of Chamberlin Farm signed a consent order agreeing that $1.2 million was just compensation for the DOT taking of the thirteen acres to the west of One Mile Road. Proceeds of the sale were distributed to most of the parties by order entered March 26, 2001. Subsequently, Jamieson died, and he was replaced by respondent Mark A. Solomon.

In 2003, the court granted final approval for the sale of the ninety-five acres to Toll NJ I, LLC (Toll) for $5,446,164. Proceeds were distributed to the various owners in accord with the percentages in the October 1999 order.

In the meantime, the court in 2001 had authorized the partition commissioner to sell the remaining portion of Chamberlin Farm that lay to the west of One Mile Road. On June 9, 2006, the court confirmed the sale to East Windsor Township of the 16.7-acre parcel that was both west of One Mile Road, and north of the property taken by DOT. The price was $1.025 million. The proceeds were distributed to the owners, again consistent with the October 1999 order.

All that remained was the 7.17-acre parcel that is the subject of the present litigation. The parcel presented several challenges to sale. It was oddly shaped. With about 225 feet of frontage on One Mile Road, the property had a depth of about 2430 feet, but was as narrow as eighty feet. It contained over two acres of wetlands, including in the middle of the otherwise buildable area. It was also in the research office zone. In June 2006, the property was under contract to a buyer, who cancelled it two years later. In June 2011, partition commissioner Solomon contracted to sell the parcel to One Mile Self Storage, LLC, for $150,000. However, the transaction did not proceed at that time. By 2015, the prospects for approvals brightened, and the parties amended the contract in June of that year, setting the contract price at $200,000.

## II.

In September 2015, partition commissioner Solomon sought the court's approval to close on the sale. He also proposed that Jonathan Preziosi replace him as partition commissioner. At the court's insistence, Solomon obtained an appraisal, which generally supported the contract price.[10]

---

[10] The appraisal attributed a $220,000 value.

In the meantime, in May 2015, Elizabeth and her husband Edward filed a pro se complaint, individually and as co-trustees of the Isaiah-to-Elizabeth Trust and the Gladys-to-Elizabeth Trust,[11] against Mellon, its employee Michael Walker, and the partition commissioner. Denominated "a complaint to quiet title," the complaint did not include a separate, explicit prayer for relief, but did "request this Court Quiet the Title to the last remaining 8 acres in East Windsor . . . ."

The complaint first noted that Isaiah and Gladys entered into agreements in 1963 with the Girard Trust Corn Exchange Bank (Girard Trust), to which Mellon is a successor, to manage their trusts and estates. Then, plaintiffs alleged that Girard Trust's vice-president, with whom Isaiah and Gladys first did business, destroyed Isaiah's will and Gladys's documents, and recorded a forged will of Isaiah. Plaintiffs also alleged that the corporate trustees actively concealed the actual documents. Plaintiffs also appeared to question the fees that Mellon and its predecessor charged the trusts and estates it managed pursuant. Citing an "Inter Vivos Trust's Deeds of Trust dated May 27, 1963, by

---

[11] As noted above, Albert was the trustee of the Gladys-to-Elizabeth Trust; and Daniel was named the trustee ad litem. We are unaware of any order removing Daniel from that position.

Isaiah and Gladys S. Barclay" plaintiffs asserted a "claim [to] the last remaining vacant farm in Esat [sic] Windsor . . . ."

Plaintiffs also alleged that the partition commissioner "had constructive knowledge" of the actual documents. Plaintiffs also alleged that defendants "often bribed judges and clerks to secure favorable rulings . . . ."

Defendants Mellon and Walker moved to dismiss for failure to state a claim. See R. 4:6-2. The partition commissioner moved to dismiss based on judicial immunity. Mellon contended that plaintiffs' claim was an unauthorized collateral attack on the court's October 1999 determination of ownership of the property. Furthermore, Mellon argued plaintiffs lacked standing to bring a quiet title action because they did not have peaceable possession. Also, they failed to serve all persons with an interest in the property. They also contended that plaintiffs' allegations regarding fees were belied by the documents attached to the complaint.

On the return date of the motion, Elizabeth, with James added as plaintiff – Edward having passed away the previous June – served, and attempted to file,

an amended complaint without defendants' consent or leave of court. See 4:9-1.[12]

Elizabeth, then in her mid-eighties, spoke briefly in opposition to the motion to dismiss, after the court declined her request to have James speak for her. She asserted vaguely that her "complaint deals with putting the original trust property back in the trust." She contended her brother William was entitled to purchase the farms from her after their father's death, but "they" denied he had that right. She also said, "Mellon conveyed the farms to a party who did not own the farms." But, she conceded that William "chose not to take" the farms.

In opposition to the partition commissioner's motion to approve the sale, James claimed that the parcel actually belonged to him. He asserted that DOT gifted it to him when he signed the consent order in 2000. He also moved to dismiss the action for lack of subject matter jurisdiction, based on the notion that he owned the property.

James conceded at oral argument that he had no proof of ownership. However, he asserted he had paid taxes on the property. Solomon responded

---

[12] Notably, Edward's estate did not formally substitute for Edward in opposition to Mellon's motion, nor is his estate a party to the appeal.

that the partition commissioner, his law firm, and the contract buyer since 2013, had paid the taxes; and James made one payment.

James attempted to raise the issue of the percentage ownership of the property. Referring to the July 1999 order, he contended that he had only stipulated to percentages without prejudice, and his claims were severed.

The court adjourned the matter twice to allow James to present documentary proof of the alleged conveyance to him, but he failed to do so, and did not personally appear. Instead, he contended in a written submission that the State owned the seven-acre parcel and the State intended to transfer title to him. However, he provided no documentation to support that position, either.

### III.

The trial court granted the motions to dismiss Elizabeth's complaint to quiet title. The court held that Solomon, as an agent of the court, was entitled to judicial immunity. The court noted that the federal district court had reached the same conclusion regarding prior claims against Solomon's predecessor.

Regarding the claim against Mellon and Walker, the court held that the October 1999 order defining ownership in Chamberlin Farm was binding and not subject to challenge. Also, plaintiffs lacked standing to bring an action to quiet title under N.J.S.A. 2A:62-1 because she failed to establish she was "in the

peaceable possession of lands." The court entered an order enjoining Elizabeth, her children, and her grandchildren from bringing any future litigation against partition commissioner Solomon. The court also ordered plaintiffs to pay the partition commissioner's costs in defending the lawsuit.[13]

The trial court granted the motion seeking approval of the sale; appointed Preziosi as the new partition commissioner; and denied James's cross-motion to dismiss. The court found that the terms of the sale were reasonable, in light of the appraisal, the dearth of serious buyers over the years, and the inherent challenges of the property. The court also stated that the issue of ownership shares was not essential to matters before it, which were the applications to approve the sale, and to appoint a new partition commissioner. The court also found that James's claim of a personal ownership interest in the land was unsupported. Citing Bentley v. Long Dock Company, 14 N.J. Eq. 480 (Ch. 1862), Hay v. Estel, 19 N.J. Eq. 133 (Ch. 1875), and Haulenbeck v. Cronkright, 26 N.J. Eq. 159 (Ch. 1875) for the proposition that a partition commissioner's report may be rejected only upon a finding of corruption, favor of mistake, the court found none, and approved the sale.

---

[13] The partition commissioner thereafter submitted a certification of fees, which is included in the record. However, we do not have before us for review a final order approving all or part of those fees.

IV.

A.

On appeal from the orders related to Elizabeth's and her late husband's quiet title complaint, plaintiffs contend there exists a cloud on the title to the final unsold seven-acre parcel.[14]  The cloud exists, they argue, because a Daniel deed conveyed an 11.67 percent interest directly to Elizabeth.  Plaintiffs also argue that the trial court lacked jurisdiction over "one-third of the property owners," Elizabeth in particular.  Plaintiffs contend the October 1999 order was interlocutory; Poling family members previously stipulated to a 17.2 percentage "without prejudice" to addressing the issue separately; and the trial court erred in relying on the 1999 order in its 2015 decision.

In further support of their challenge to the October 1999 order, plaintiffs note that the Daniel deeds were included in the recitals of some subsequent deeds – such as the deed transferring the ninety-five-acre parcel to Toll.[15]  Also, Albert at one point unsuccessfully sought to set aside the Daniel deeds.  Plaintiffs also argue their quiet title action is somehow based on alleged discrepancies in the

_____

[14]  We acknowledge that plaintiffs refer to the parcel as 8.89 acres.

[15]  Plaintiffs also note that the deed incorrectly stated that Isaiah Barclay died intestate.

fee agreements between Isaiah and Gladys and Girard Trust, beginning in the 1960s.

They challenge the award of fees because their claims were not frivolous; defendants have unclean hands; and have been unjustly enriched.

B.

In his appeal from the orders related to the partition commissioner's motion to approve the sale of the final unsold parcel, James echoes themes raised by his mother. He argues that the October 1999 order was contrary to the court's prior orders, including the 1998 order denying Albert's motion, the July 1999 order severing the Poling family claims, and the Daniel deeds. He contends that entry of the October 1999 order violated the law of the case doctrine. He also alleges the court purposely did not require the recording of the October 1999 order, to conceal the discrepancy with the Daniel deeds, and to protect the interests of the purchasers, Toll and East Windsor Township. He contends the order was invalid because it was not recorded.

He contends that as a result of the October 1999 order, the proceeds of the sales were misdirected to the trusts, instead of to family members directly. He contends the partition proceeding should be dismissed because it does not

represent all cotenants, i.e. the Poling family members in their individual capacity.

James contends that Albert, as trustee, was required by the terms of the controlling trust document to execute deeds "out-of-trust" to the beneficiaries, but he failed to do so. Daniel did. Albert tried unsuccessfully to set aside the Daniel deeds, until the October 1999 order. James contends he's entitled to rents and profits for ouster from 18.3 percent of the land.

## V.

## A.

We begin with the standard of review. We review de novo the trial court's order dismissing Elizabeth's and her late husband's complaint for failure to state a claim under Rule 4:6-2(e). Rezem Family Assocs., LP v. Borough of Millstone, 423 N.J. Super. 103, 114 (App. Div. 2011). "[O]ur inquiry is limited to examining the legal sufficiency of the facts alleged on the face of the complaint." Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989). "For purposes of analysis plaintiffs are entitled to every reasonable inference of fact." Ibid. We also review de novo other questions of law. See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

However, we deferentially review the trial court's exercise of its equitable authority and its application of equitable doctrines. See Kurzke v. Nissan Motor Corp., 164 N.J. 159, 165 (2000); Baez v. Paulo, 453 N.J. Super. 422, 436 (App. Div. 2018). That equitable authority includes the power to order the partition of property. See Newman v. Chase, 70 N.J. 254, 263 (1976). We apply an abuse-of-discretion standard to the court's decision to impose sanctions for frivolous or vexatious litigation, see McDaniel v. Man Wei Lee, 419 N.J. Super. 482, 498 (App. Div. 2011), to award of attorney's fees, see McGowan v. O'Rourke, 391 N.J Super. 502, 508 (App. Div. 2007), and to enjoin vexatious and harassing litigation, see Rosenblum v. Borough of Closter, 333 N.J. Super. 385, 391-92 (App. Div. 2000).

B.

1.

We consider first the court's order dismissing the quiet title action. The court's order was warranted on several grounds: plaintiffs failed to satisfy the jurisdictional prerequisite for bringing the action; they failed to serve interested parties; and the action constituted an unjustified collateral attack on the October 1999 order. Plaintiffs' reliance on the Daniel deeds is also misplaced.

23

Neither Elizabeth nor her late husband met the jurisdictional prerequisite for bringing a quiet title action: peaceable possession. N.J.S.A. 2A:62-1 states:

> Any person in the peaceable possession of lands in this state and claiming ownership thereof, may, when his title thereto, or any part thereof, is denied or disputed, or any other person claims or is claimed to own the same, or any part thereof or interest therein, or to hold a lien or encumbrance thereon, and when no action is pending to enforce or test the validity of such title, claim or encumbrance, maintain an action in the superior court to settle the title to such lands and to clear up all doubts and disputes concerning the same.

If the land is "wild . . . or unimproved" such that neither the owner nor person claiming ownership is in actual peaceable possession, then payment of taxes for five consecutive years before filing the action creates a presumption of peaceable possession. N.J.S.A. 2A:62-2; Harvey v. Orland Props., Inc., 108 N.J. Super. 493, 500-01 (Ch. Div. 1970), aff'd, 118 N.J. Super. 104 (App. Div. 1972).

The seven-acre parcel is undeveloped; yet it apparently had been farmed over the years. Whether or not it is deemed wild or unimproved, plaintiffs failed to demonstrate peaceable possession. They did not actually possess the property, nor did they pay taxes on it.

Plaintiffs failed to satisfy a second statutory prerequisite. An action to quiet title may be maintained only "when no action is pending to enforce or test the validity of such title . . . ." N.J.S.A. 2A:62-1. The pending partition action

24

is such an action. Plaintiffs' right to the property has been litigated in the partition action. In particular, the October 1999 order, which plaintiffs challenge in the quiet title action, remains interlocutory, as the partition action is still ongoing, even after entry of the orders on appeal.[16] The plaintiffs' views (and those of other Poling family members) have been duly presented in the partition action. Although James was not permitted to serve as attorney for his family members in the partition action, a 1996 order recognized that Elizabeth, Edward and other Poling family members agreed to be bound by James's actions in the case, and waived the need to receive service of papers.[17]

Instead of pursuing their rights in the partition action, plaintiffs seek relief based on an inappropriate collateral attack on the October 1999 order. See Catabene v. Wallner, 16 N.J. Super. 597, 601 (App. Div. 1951) (explaining that a "collateral attack" is an "attempt in a separate and independent proceeding to question the integrity and validity of any adjudication in another proceeding"). Collateral attacks are barred in the interests of repose, unless the order or judgment is procured by a fraud on the court or third parties, or the issuing court

---

[16] We discuss below the interlocutory nature of those orders.

[17] The family members were free to notify the court if they wished to receive pleadings or to take a position contrary to James.

lacked jurisdiction.  Reaves v. Egg Harbor Twp., 277 N.J.  Super. 360 363 (Ch. Div. 1994).

We discern no basis to permit a collateral attack of the October 1999 order. As noted, plaintiffs are not strangers to the partition action or the October 1999 order.  In any event, plaintiffs have not demonstrated that the parties to the October 1999 order committed a fraud on the court, or on third parties.

Furthermore, plaintiffs failed to name and serve all the parties with an interest in the property.  The quiet title action sought to establish plaintiffs' interest in the property, to the detriment of all the other individuals and trusts who were identified, and whose percentage shares were quantified, in the October 1999 order.  Yet, plaintiffs only sued Mellon, its employee Walker, and partition commissioner Solomon.  See R. 4:28-1.

As a substantive matter, plaintiffs misplace reliance on the Daniel deeds. As noted above, Daniel was appointed a trustee ad litem in place of Albert, who had a conflict, for the Gladys-to-Elizabeth Trust and James's Grandchildren Trust.  Although the court did not specify the scope of Daniel's powers, we are satisfied, based on the circumstances that prompted his appointment, and persuasive authority from other jurisdictions, that Daniel's authority was limited

to representing the positions of the trust in the litigation. In short, he lacked the authority to transfer trust property to the grantees on the Daniel deeds.

"Ad litem" means "for the suit." Bryan Garner, A Dictionary of Modern Legal Usage (2d ed. 1995) at 28. In Getty v. Getty, 252 Cal. Rptr. 342, 347 (Ct. App. 1988), the court approved the appointment of a trustee ad litem to conduct lawsuits, to address a conflict of interest.

> Since the court has the power to remove a trustee entirely in the exercise of its general equity jurisdiction . . . the removal from the existing trustee of his power to conduct certain lawsuits and appointment of a trustee ad litem, where there is a conflict of interest, are also an exercise of that general equity jurisdiction. As courts may entirely remove a trustee and appoint a replacement . . . appointment of a trustee ad litem with limited powers to conduct certain litigation is an intrinsically included exercise of the court's inherent equity power within its greater power to remove and replace the trustee.
>
> [Ibid.]

See also Selig v. Morrison, 321 S.W.2d 769, 770 (Ark. 1959) (approving appointment of trustee ad litem "solely for the purpose of conducting pending litigation"); In re Kenna's Estate, 34 A.2d 617, 619 (Pa. 1943) (stating that where a trustee is not acting for the best interest of the trust's beneficiary, "it is incumbent

27

upon the judge to appoint a separate and independent guardian or trustee ad litem for that particular litigation").[18]

As Daniel lacked the authority to convey the property deposited in the trusts, the trusts remained proper parties to the partition action; no essential parties or owners were excluded; and the challenge to the court's jurisdiction based on the Daniel deeds must fail.

2.

We turn next to the dismissal of the claims against partition commissioner Solomon, which rests on an additional footing. Appointed pursuant to Rule 4:63-1, and serving as an officer of the court, a partition commissioner may enjoy quasi-judicial immunity.

To overcome judicial immunity, it is not enough that a judge's action "was in error, was done maliciously, or was in excess of his [or her] authority . . . ." Pasqua v. Council, 186 N.J. 127, 150 (2006) (quoting Stump v. Sparkman, 435 U.S. 349, 356-7 (1978)). A judge "will be subject to liability only when he [or she] has acted in the 'clear absence of all jurisdiction.'" Pasqua, 186 N.J. at 150

---

[18] We acknowledge that the Restatement (Third) of Trusts, § 37 cmt. g, illus. 10 (Am. Law Inst. 2003) contemplates that in a conflict situation, a trustee ad litem may be appointed "to handle a specific, conflict-sensitive transaction". However, the only transaction prompting Daniel's appointment was the partition.

(quoting Stump, 435 U.S. at 356-57).  The doctrine is essential to assure the independent exercise of judicial authority, without fear of consequences. Pasqua, 186 N.J. at 150.

Our Supreme Court in Bedrock Foundations, Inc. v. Geo. H. Brewster & Son, Inc., 31 N.J. 124, 140 (1959) noted that "judicial immunity has been extended . . . [to] state administrative agents and lesser administrative officials who are called upon to exercise judgment and discretion."  Federal courts have extended judicial immunity to child custody evaluators "because they acted as 'arms of the court' and performed functions integral to the judicial process." Hughes v. Long, 242 F.3d 121, 127 (3d Cir. 2001).

We acknowledge that quasi-judicial immunity is limited to persons exercising judicial authority.  Cf. Levine v. Wiss & Co., 97 N.J. 242, 252 (1984) (stating "court-appointment is not a talisman for immunity" and denying immunity to court-appointed valuation experts who "engaged in no adjudication and exercised no quasi-judicial power").  In recognizing quasi-judicial immunity, federal courts have drawn a distinction between ends and means. Coleman v. Dunlap, 695 F.3d 650, 653 (7th Cir. 2012).  Thus, with respect to a claim against a partition commissioner, "only the ends of the order – not the

29

means used to execute the order – are protected by an order to sell (unless the order directs the commissioners to use specific means)." Id. at 654.[19]

Yet, we need not chart the boundaries of quasi-judicial immunity to conclude that the actions of partition commissioner Solomon with respect to the seven-acre parcel are entitled to quasi-judicial immunity. He acted upon court appointment and direction to sell Chamberlin Farm. Only the seven-acre parcel remained. Plaintiffs do not challenge the means the partition commissioner used, such as the price Solomon was able to secure; or the manner in which he found a buyer of this challenging parcel. Rather, their broad claims of misfeasance arise out of the complaint that the property should not have been sold at all, and on whose behalf. However, the court, not the partition commissioner, made those decisions.

Finally, we turn to the award of monetary sanctions against plaintiffs, and injunction of future claims against the partition commissioner. "[P]ro se parties are regarded as lawyers" under Rule 1:4-8, the court rule governing the award of fees for frivolous litigation. Trocki Plastic Surgery Ctr. v. Bartkowski, 344

---

[19] Based on intervening United States Supreme Court precedent, the court in Coleman limited the holding in Ashbrook v. Hoffman, 617 F.2d 474, 476-77 (7th Cir. 1980), wherein the court had held that partition commissioners were immune from claims that they mismanaged an ordered sale.

A-1502-15T1

N.J. Super. 399, 405 (App. Div. 2001). In particular, a movant must afford the allegedly frivolous pro se litigant "the 'window of opportunity' to withdraw the 'frivolous action' provided for in R. 1:4-8(b)(1)." Id. at 406. The rule requires a movant for sanctions to certify that he or she has served on the opposing party a notice stating that the pleading is believed to be frivolous and a demand that it be withdrawn within twenty-eight days (or less time if the sanctions motion pertains to a motion returnable sooner). R. 1:4–8(b)(1). If the objectionable pleading is withdrawn within the prescribed time period, then there is no exposure to sanctions. Ibid. Also, the motion for sanctions must be filed separately from other applications. Ibid.

A party seeking fees must strictly comply with the Rule. See, e.g. State v. Franklin Savings Acct. No. 2067, 389 N.J. Super. 272, 281 (App. Div. 2006); cf. Toll Bros., Inc. v. Twp. of W. Windsor, 190 N.J. 61, 69 (2007) (strictly applying the rule, pursuant to Rule 1:4-8(f), to a party). The trial court did not address whether the partition commissioner complied with the rule's requirement, and the record does not include any evidence of such compliance. Therefore, we are constrained to vacate the award of fees.

We also are constrained to vacate the order enjoining Elizabeth, her late husband, her children and grandchildren from commencing litigation against

Solomon.  In <u>Rosenblum</u>, we recognized the power of an Assignment Judge to bar future litigation "where a pattern of frivolous litigation can be demonstrated."  333 N.J. Super. at 391.  The power is reserved for the "rare case."  <u>Id.</u> at 392.  The court is also required to consider "whether the prior litigation has resulted in sanctions and whether the imposition of sanctions can have a deterrent impact."  <u>Ibid.</u>

Here, the Assignment Judge did not enter the injunction, nor is there evidence that she delegated her authority to do so to the General Equity judge.  Furthermore, "a pattern of frivolous litigation" may be demonstrated only if we assign responsibility to Elizabeth and her late husband for the federal actions filed by their children.  Absent evidence that plaintiffs directed that litigation, we are not prepared to do so.

## C.

Turning to James's appeal from the orders approving the sale of the seven-acre parcel, appointing a new partition commissioner, and denying his motion to dismiss, we note that all three orders are interlocutory, and no motion for leave to appeal was filed.  The orders are interlocutory because not all issues as to all parties have been adjudicated.  <u>See</u> <u>Grow Co. v. Chokshi</u>, 403 N.J. Super. 443, 457-58 (App. Div. 2008).  For example, as the sale has not closed, the court

32

has not been asked to approve distribution of the proceeds. However, we choose to grant leave to appeal nunc pro tunc, to resolve the issues before us, as they have been pending for a lengthy period of time, and a decision may assist in the final resolution of this long-standing dispute. See Caggiano v. Fontoura, 354 N.J. Super. 111, 125 (App. Div. 2002).

James's argument that the court lacked jurisdiction rests on his contention that the Daniel deeds transferred various property "out of trust," and the grantees were not formally made parties to the partition action. We are unpersuaded for the same reasons we have set forth in connection with the dismissal of the quiet title action.

James also challenges the trial court's 1999 order establishing the respective ownership interests of the family. The order is interlocutory – for the same reasons the orders on appeal are interlocutory. However, James did not identify the order in his notice of appeal. See R. 2:5-1(f)(3)(A) (stating that a notice of appeal "shall designate the judgment, decision, action or rule, or part thereof appealed from"); Fusco v. Bd. of Educ. of Newark, 349 N.J. Super. 455, 461-62 (App. Div. 2002) (stating that appellate review pertains only to judgments or orders specified in the notice of appeal).

In any event, resolution of the issue of the specific allocations of ownership – as distinct from the identity of owners, raised by the Daniel deeds – is not implicated by the partition commissioner's motion to approve the sale of the final seven acres. Rather, it pertains to the distribution of the proceeds.

Finally, James's argument that the seven-acre parcel was gifted to him; or in the alternative, promised to be gifted to him, lacks documentary support.

VI.

To the extent not addressed, the remaining arguments of the appellants in both cases lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

In sum, in A-3507-15, the trial court's orders are affirmed. In A-1502-15, the order dismissing the complaint against Mellon and Walker is affirmed; that part of the order dismissing the complaint against Solomon is affirmed; and that part of the order enjoining future litigation and awarding costs is reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION